(No. 11343.—Decree affirmed.)
JOSEPH MARION DAVIER, Plaintiff in Error, *vs.* WILLIAM B. KAISER, Exr., *et al.* Defendants in Error.

*Opinion filed October 23, 1917.*

1. EVIDENCE—*what is not competent evidence of contents of a letter.* Secondary evidence of the contents of a letter which has been lost or destroyed cannot be given by a witness who could neither read nor write and whose knowledge of such contents was derived from what other persons told him.

2. SAME—*when evidence does not tend to prove a certain state of facts.* Evidence which is as consistent with one state of facts as another has no tendency to prove either state of facts as against the other.

3. SPECIFIC PERFORMANCE—*what proof is necessary to enforcement of parol contract.* The proof which will justify a court of equity in decreeing the specific performance of a contract the existence of which depends upon parol testimony must be clear and conclusive, and there must be no reasonable doubt that the contract was made and that all its terms have been clearly proved.

4. SAME—*a contract must be fair and just.* Contracts which a court of equity will specifically enforce must be full and complete, certain in their terms and fair and just in their provisions.

5. SAME—*when contract is oppressive.* A parol contract whereby a brother and sister agree to leave their property to children of relatives they had never seen would be oppressive as to the husband or wife of such brother and sister and their children, in case they should marry and have children; and the fact that neither of them was married at the time, and never did marry, does not alter the principle involved.

WRIT OF ERROR to the Circuit Court of Hancock county; the Hon. ROBERT J. GRIER, Judge, presiding.

HARTZELL, CAVANAGH, GREEN & MARTIN, for plaintiff in error.

O'HARRAS, WOOD & WALKER, for defendant in error William B. Kaiser, executor.

Mr. JUSTICE DUNN delivered the opinion of the court:

Joseph Marion Davier filed a bill in the circuit court of Hancock county against the heirs and devisees of Mary F. Davier and the executor of her will, the prayer of which was that the court decree the specific performance of an alleged contract by Mary F. Davier to make a will giving all her property to the complainant, and that the executor of her will be decreed to hold the title to such property in trust for the complainant and to convey it to him. The bill was answered, a replication was filed and the cause was referred to a master, who heard the evidence and reported it, together with his conclusions. Exceptions to his report were overruled, a decree was entered dismissing the bill for want of equity, and complainant sued out a writ of error.

It was alleged in the bill that Antoine N. Davier and Mary F. Davier, who were brother and sister, living in Hancock county, and unmarried, in 1896 proposed to Peter Davier and Helene Davier, who were the father and mother of the complainant and his sister, Pauline Louise Davier, and were living with their two children in St. Etienne, France, that if the parents would come to Antoine and

Mary Davier at LaHarpe, in Hancock county, and would bring their two children and live in or near the neighborhood with Antoine and Mary, and if, after so coming, it should be satisfactory to Peter and Helene and to the complainant and his sister, Antoine and Mary would agree with the complainant and his sister that if they would come and take care of and associate with Antoine and Mary until their death these two would at their death will all their real and personal property which they or either of them might own at their death, to the complainant and his sister; that Peter and Helene came with their children to the home of Antoine and Mary, and afterward Antoine and Mary proposed to the complainant and his sister, who were minors, fourteen and twelve years of age, respectively, that if the sister, Pauline, would live with them until they both died, and, together with the complainant, would take care of them, live in and about the farm which they owned and render to them such services as they should request from time to time, then Antoine at his death would will all his property to Pauline and that Mary would will all hers at her death to the complainant; that the complainant and his sister accepted the proposition; that Pauline lived at the home of Antoine and Mary as a part of their family and worked in their house, and both she and the complainant performed all the services requested of them by Antoine and Mary and fully performed the agreement on their part satisfactorily to Antoine and Mary; that Antoine died in 1907, having fully complied with the contract on his part by making a will devising all his property to Mary for life with remainder to Pauline, and Mary died on July 29, 1910, having failed to comply with the contract on her part, but, on the contrary, having made a will devising the greater part of her estate, not to the complainant, but for the establishment and support of a hospital at LaHarpe.

It appears from the evidence that about 1860 Antoine and Mary Davier, natives of France, about seven and nine

years of age, respectively, were brought by their parents to
Hancock county, where they spent the rest of their lives.
Their parents died about twenty years later.   Neither of
them ever married.   They worked together as gardeners
and afterwards as farmers, having their business and prop-
erty in common, and by 1897 were the owners of 240 acres
of land, for which they were considerably in debt.   During
the rest of their lives they increased their holdings of land
and reduced their indebtedness.   Peter Davier, who was re-
lated to them, was a silk weaver living with his family at
St. Etienne, in France, where the parents of Antoine and
Mary had lived before coming to America.   Few French
people, or none, lived in the neighborhood of Antoine and
Mary, and before 1896 a correspondence had been carried
on between Antoine and Mary on the one hand and Peter
and Helene on the other, which finally resulted in the latter
leaving St. Etienne with their family in 1897 and coming
to this country, the expenses of their removal being paid
with money sent by Antoine and Mary.   Joseph, the plain-
tiff in error, was then twelve years old, and Pauline, his
sister, nine.   The whole family went to the home of Antoine
and Mary, where all lived together for several years, An-
toine and Mary paying Peter and his wife for the services
they performed.   Afterward Antoine and Mary moved to
another farm which they owned, taking Pauline with them,
Joseph staying with his parents.   Peter continued on the
farm from which Mary and Antoine had removed and
farmed it under an arrangement whereby he received half
the profits.   Later Peter and his wife and Joseph moved to
the same farm where Antoine and Mary lived and bought
half the stock and implements on their farms, and by an
agreement with them farmed their lands until Antoine's
death, in 1907.   Pauline remained in the house of Antoine
and Mary, receiving no compensation.   Joseph worked with
his father and Antoine but received no compensation from
the latter, though he worked for him in connection with

280 — 22

his other business in which Joseph's father was not interested, and while so working he went to the home of Antoine and Mary and remained with them. After Antoine's death Joseph purchased his father's interest in the partnership agreement with Antoine and Mary and executed a lease for all of Mary's land, which continued to her death. The provisions of this contract were not observed by the parties, but Mary demanded of Joseph such sums of money and at such times as she needed them and he paid them to her. Antoine by his will devised his property to Mary for life with remainder to Pauline in fee. Mary by her will, executed on the day of her death, devised most of her property for the establishment and conduct of a hospital.

It is the contention of the plaintiff in error that about Christmas, 1896, Mary Davier wrote Peter a letter proposing that if the latter and his wife would come to Hancock county and live near Antoine and Mary, and if it should prove satisfactory to Peter and his family, Antoine and Mary would agree that if Joseph and Pauline would come and take care of and associate with them until their death they would will all their property to Joseph and Pauline. The plaintiff in error also contends that it was afterward agreed that Antoine should will all his property to Pauline and Mary all hers to Joseph. The letter of Christmas, 1896, was not introduced in evidence but secondary evidence was offered in regard to it. The proof of its existence and contents depends upon the testimony of plaintiff in error's parents and sister. His father testified that "Antoine wrote if we would come and help keep company with themselves that they would help Joe and Pauline, and after their death the property and things would be for Joe and Pauline." It appears, however, from the evidence, that Peter, the father, was unable to read or write, and his knowledge of the contents of the letter must therefore have been derived from the statement of some other person, and his testimony in regard to it is therefore not competent evi-

dence. The sister, Pauline, was nine years old at the time. She did not say that she ever saw or read the letter, but her testimony in regard to it is: "I can remember, when I was quite small, of the folks getting letters from these cousins, Mary and Antoine, wanting them to come and live with them, and they wrote for a long time, until one time I remember they had made him an offer that if he would come and we would keep them company and help them, that what Antoine had would be mine and what Mary had would be Joe's, and that was what really decided them to come. I can remember that quite plain, for I was nine years old at that time, and I can remember the last letter at that time." This testimony, given in 1913, was the recollection of a child nine years old sixteen years after the event. It does not agree with the testimony of either her father or mother. It is entirely consistent with her testimony that she never saw or read any letter to her parents from Mary and that her testimony refers to knowledge derived from a conversation with her father and mother, and this is the natural inference to be drawn. Where evidence is as consistent with one state of facts as another it has no tendency to prove either as against the other, and Pauline's testimony therefore cannot be regarded as tending to show that she had ever seen or read the letters testified about. Helene Davier, the mother, testified that she received letters from Antoine and Mary Davier, which were burned; that she stayed in France after her husband left, sold the furniture, cleaned house, piled up trash,—letters and all,—and burned everything, not knowing she would need them; that about Christmas time, 1896, she received a letter from Mary; that "the first part of the letter contained greetings of the season; about midway of the letter Mary Davier was saying that they were alone and had no one to love in this country; if the French Daviers would consent to come here they would never regret it, because they would leave their wealth to their children,

Joseph and Pauline, and thereby create a position for them in life, and had it not been for this they would not have come, because she herself was much averse to coming."

The Daviers in America and those in France had never seen one another. It is hardly credible that Antoine and Mary, owning their farm and living in America, unacquainted with the French Daviers, would offer, as Helene testified, if they would come to America to live, to leave all their property to the French relatives' children without qualification. That is the offer which Helene testifies to. This, also, is the testimony of the witness, sixteen years afterwards, to the contents of a letter which she did not think of sufficient importance to preserve when she was burning the "piled-up trash" of her home before leaving it. She recalls only the important fact that Antoine and Mary would leave their wealth to her children, but the other terms or conditions upon which the gift was to be made, which necessarily must have been in the minds of the parties and contained in the letter, have escaped her memory.

Contracts which a court of equity will specifically enforce must be full and complete, certain in their terms and fair and just in their provisions. The contract sought to be enforced here would have been exceedingly oppressive. In case of the marriage of Antoine or Mary the rights of the husband or wife and children would have been very seriously abridged or entirely destroyed. The fact that neither of them married is immaterial to the principle involved. The enforcement of a contract of this character might be productive of great injustice. Courts of equity look with jealousy upon evidence offered in support of a contract to make a disposition of the property of a deceased person different from that provided by law and will weigh such evidence in the most scrupulous manner. (*Sloniger* v. *Sloniger,* 161 Ill. 270; *Woods* v. *Evans,* 113 id. 186.) The proof which will justify a court of equity in decreeing the specific performance of a contract the existence of which

depends upon parol testimony must be clear and conclusive, and there must be no reasonable doubt that the contract was made and that all its terms have been clearly proved. (*Mould* v. *Rohm,* 274 Ill. 547; *Reynolds* v. *Wetzler,* 254 id. 607; *White* v. *White,* 241 id. 551.) The existence of the contract alleged in the bill is not shown by the evidence. The proof of the contents of the letter is not satisfactory though it is the basis of the complainant's whole case. The letter was not considered of sufficient importance to be preserved by the only person who appears to have read it. The proof of its contents rests upon her testimony. The terms, so far as testified to by her, are unreasonable and unnatural. The consideration she mentions is entirely inadequate. The evidence shows that after the French Davier family came to America their relations with Antoine and Mary were very close and friendly. The relations were profitable to Peter and Helene as well as to Antoine and Mary. Pauline, after several years, went to live in Antoine and Mary's family as a member of it and after his death received Antoine's property. Joseph worked for his father and sometimes for Antoine, but he lived in Antoine's family only occasionally, when he was working for him. After Antoine's death he entered into a contract with Mary for conducting the farm, though the terms of this contract were not strictly adhered to by them. The evidence shows numerous statements by Antoine and Mary expressive of their intention to give their property to Pauline and Joseph, but nothing appears in the evidence tending to establish that this intention arose out of any contract to do so.

The circuit court was right in holding that the evidence failed to establish the contract and in dismissing the bill, and its decree will be affirmed.  *Decree affirmed.*