CHARLES J. HUTTON *vs.* SARAH R. BUSAYTIS, Admx. *et al.* Appellants.—(JAMES C. FITZPATRICK, Admr. *et al.* Appellees.)

*Opinion filed June 22, 1927—Rehearing denied October 6, 1927.*

1. ADOPTION—*proof must be clear and satisfactory to warrant specific performance of alleged lost adoption contract.* Where a child has fully performed its obligations under an adoption contract it is entitled to a decree for specific performance on the part of the adopting parents where it would be inequitable to allow the contract to remain unenforced; but where the agreement to adopt is alleged to have been in writing and the document is lost, to justify a court of equity in decreeing specific performance, involving a conveyance of property, the proof must so clearly establish the fact that the contract was made and what its terms were that the evidence cannot be harmonized with any other theory.

2. SAME—*what evidence is not sufficient to establish adoption contract.* Evidence that a child from an orphan's home was taken "to raise," to be brought up, educated, supported and maintained as a member of the family taking the child, and testimony of neighbors and others that the foster parents made statements in casual conversations indicating their intention to adopt the child and to convey to it their property, are not sufficient to establish an adoption or agreement to adopt so as to warrant specific performance of the alleged promise to make the child an heir, even though the child has performed its part of the alleged agreement in services rendered the foster parents.

3. DESCENT—*evidence of contracts altering statutory disposition of property will be carefully weighed.* Courts of equity accept with caution evidence offered in support of a contract to make disposition of the property of a deceased person different from that provided by law and will weigh such evidence scrupulously.

4. SPECIFIC PERFORMANCE—*parol contract for conveyance must be clearly shown.* To entitle a party to specific performance of a parol contract for a conveyance the contract must be certain and definite and must be established by evidence free from suspicion.

APPEAL from the Circuit Court of Macoupin county; the Hon. FRANK W. BURTON, Judge, presiding.

JESSE PEEBLES, and EDMUND BURKE, for appellants.

JOHN P. MADDEN, and MURPHY & HEMPHILL, for appellees.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

December 3, 1921, Charles J. Hutton filed a bill in the circuit court of Macoupin county alleging that in the year 1882 he was, at the age of seven years, taken from a charitable institution in the city of Quincy and placed in the home of John and Bridget Hutton, of Gillespie; that the institution and the Huttons entered into a contract in writing which provided that the Huttons should adopt him and make him their heir; that at the time complainant was taken into their home the Huttons had no children and that none were ever born to them; that the Huttons were then persons of small means and were engaged in a general merchandise business in Gillespie; that complainant served them faithfully for twenty years and helped them accumulate a considerable estate; that he received no compensation except support and maintenance, but his services were performed by him in reliance on his belief that he was their adopted son; that notwithstanding the written agreement to adopt him and make him their heir the necessary steps to perfect a legal adoption were never taken; that Hutton died testate, devising and bequeathing all his property to Bridget, and that she died intestate in September, 1921; that she left as her heirs Sarah Busaytis and Mary Grass,

the former of whom was appointed administratrix of her estate. Busaytis and Grass were made defendants to the bill, which concludes with a prayer that complainant be declared to be the adopted son of John and Bridget Hutton and entitled to all the property left by Bridget. On June 17, 1926, an amended bill was filed, which contains substantially the same allegations as the original bill, and states that the agreement to adopt was entered into with Rev. Storb, a Catholic priest who was an officer of the orphans' home. The defendants answered, denying that the Huttons, or either of them, entered into a written contract or into any contract with any person or institution to adopt Charles and make him their heir. They admit that Charles made his home with John and Bridget Hutton for many years, but deny that he contributed to their prosperity or that he performed any services in reliance on a belief that he was their adopted son. While the cause was pending in the trial court Charles died, and in his stead were substituted James C. Fitzpatrick, administrator of his estate, and Lulu, James, Erwin, Horace, Edith, Louise and Betty Maude Hutton, his heirs. The cause was referred to a master in chancery, who filed his report recommending a decree in accordance with the prayer of the bill. Exceptions to the report were overruled, the decree was entered, and this appeal followed.

The St. Aloysius Orphans' Home Society of Quincy was organized in 1852. Since that time it has conducted an orphans' home at Quincy and has placed orphan children in private homes. The records of the society were kept by the officers but many of the early records are not now available. The secretary of the board of administration produced the only records that could be found which referred to Charles Lish, later known as Charles Hutton. These records were written in the German language. As translated by the secretary the first entry reads: "Charles Lish, Rockport, Ill., 1882, taken at the age of about seven years,

February 13, 1882. To-day the orphan child Charles Lish, of Rockport, Illinois, some time previously of East Hannibal, was admitted to the orphanage. Diocese to pay half the usual board. The father died in the beginning of the year in St. Mary's Hospital at Quincy, Illinois." The second entry reads: "Quincy, Ill., March 29, 1882. To-day the orphan child, Charles Lish, of Rockport, Ill., was given to the family Mr. Hutton at the request of Rev. Father Storb from there, with the consent of Rev. Father Bruener and the board of administration, to raise at Hillsboro, Ill." There is no record of an adoption of the child by the Huttons nor of an agreement to adopt. The secretary testified that the children of the home were placed in private families as soon as a satisfactory home could be found; that they were usually placed with the family on probation, and later adoption was urged; that there was usually a written agreement between the home and the family that took the child; that the home insisted that the family give the child a good home and look after its spiritual as well as its material welfare; that the child was to be given an allowance for work, and if adopted was to have a child's interest in the adopting parents' estate. The secretary had been connected with the society for thirty-three years and had been a member of the board of administration for eight years. His father had been a member of the society for sixty years and had theretofore served as president and secretary of the society. The secretary found duplicate copies of contracts under which children had been placed by the home, but he found no copies of contracts dated prior to 1882. In the baptismal records of Sts. Simon and Jude's Church, Gillespie, Illinois, appears the following: "On the 16th day of April, A. D. 1882, I baptized Charles James, whose parents are unknown, born, perhaps, in the year 1874. Sponsors were John Thomas Hutton and Bridget Teresia Hutton. [Signed] Herman Gesenhues." In the Hutton fam-

ily Bible appears the following: "Charles Lish, took him from Quincy to raise, March 28, 1882, at the age of seven years. Baptized in the Catholic church at Gillespie, Illinois, on the 16th day of April, 1882, and named Charles James Hutton."

There was no legal adoption of the child and no evidence of any attempt to adopt. The Huttons referred to Charles as their son or their adopted son, and stated to some of the people of the community that they had adopted him and to others that they intended to adopt him and make him their heir. According to some of the witnesses Charles addressed Mr. and Mrs. Hutton as "father" and "mother," and according to others as "pa" and "ma." From the time he came into their home until their death he was a dutiful and affectionate son. After his marriage, at the age of twenty-seven years, he continued to bestow filial affection on his foster-parents, calling at their home frequently, sometimes daily, to render such help as he could to make them comfortable and happy. The Huttons referred to his children as their grandchildren and took the usual interest of grandparents in them. The name of Mrs. Hutton's father was James Erwin, and in accordance with her wish one of Charles' boys was named James and another Erwin. Sarah Busaytis and Mary Grass are nieces of Mrs. Hutton and prior to their marriage they made their home with her.

The existence of a written contract to adopt Charles Lish, later known as Charles James Hutton, depends on the testimony of Joseph Lish, his brother. According to his testimony he (Joseph) was about two years old when his parents died and he was placed in the orphans' home at Quincy. He remained there about eight years and then was placed with a family named Haoebing, with whom he remained about eight years. He left them and went to Moberly, Missouri, where one of his sisters lived. In 1901 he came to Gillespie and made his home with his brother Charles. He worked as a farmhand and as a clerk in

Charles' store. Charles introduced him to John and Bridget Hutton. He visited them at least once a week at their invitation and often had meals with them. On one occasion, after Hutton's death, he stayed in the home for five weeks. Mrs. Grass was there at that time, and later Mrs. Busaytis lived with Mrs. Hutton. Mrs. Hutton talked with him frequently about Charles and about getting him from the orphans' home. She said that she and her husband had mentioned to Father Storb that they ought to have a boy to raise, and she added, "What do you think? There came Father Storb right back here with the boy and adoption papers for us to sign." She said that Hutton told Father Storb they had better not sign the papers right away but wait until they had decided whether they liked the boy, but that she said, "Indade, and you will sign these papers; we told Father Storb to get this boy from the orphans' home, and, indade, you will sign these papers;" whereupon Hutton replied, "All right, Mrs. Hutton; you are the boss," and they both signed the papers. She did not say whether Father Storb or anyone else signed them nor did she state the contents of the papers which were signed. This conversation was related to him every time he came to call on her. She said Father Storb told them he could not leave the boy unless they signed the papers. She said they had never paid Charles any wages until after he married, and that then she gave him $10 a month. One Sunday afternoon he called at the house, and when he went in he found her looking at the contents of a box which was about fifteen inches long and ten inches wide. It contained many papers, and Mrs. Hutton said, "I have just been looking over some old deeds and I have run across Charlie's adoption papers." She held up a paper on which there were some printing and some handwriting. The witness did not read the paper and did not know its contents. On this occasion Mrs. Hutton expressed great affection for Charles and said that he would never regret his kindness to her, be-

cause he would get all her property when she was through
with it.

Twenty witnesses who were familiar with the family
relations of Charles Hutton and his foster-parents testified
to his being an industrious, attentive and affectionate son
and to the love of the Huttons for him. They related many
conversations in which the Huttons discussed the circum-
stances of getting him from the home, their appreciation
of his services, their purpose to adopt him and make
him their heir, and other intimate family matters, but not
one of them said that John or Bridget Hutton ever men-
tioned that they had signed an agreement to adopt Charles
when he was delivered to them by Father Storb or that
they signed any other document. One witness testified that
Mrs. Hutton said something about an agreement to give
him the name "Charles Hutton," but this same witness said
that she did not say anything about what was said when
the priest brought the child to them.

Where a child has fully performed its obligations under
a contract to adopt it and allowing the contract to remain
unenforced would be inequitable, it is entitled to a decree
for specific performance of the contract if it be proven
according to the standard of proof required: (*Hickox* v.
*Johnston,* 113 Kan. 99, 27 A. L. R. 1322; *Odenbreit* v.
*Utheim,* 131 Minn. 56, L. R. A. 1916-D, 421; *Crawford*
v. *Wilson,* 139 Ga. 654, 44 L. R. A. (n. s.) 773; *Barney* v.
*Hutchinson,* 25 N. M. 82, 177 Pac. 890; *Lee* v. *Berming-
ham,* 199 Ill. App. 497.) But where the agreement to adopt
is alleged to have been in writing and the document is lost,
the proof which will justify a court of equity in decreeing
the specific performance of the contract must be clear and
must establish with reasonable certainty the fact that the
contract was made. (*Davier* v. *Kaiser,* 280 Ill. 334; *Mould*
v. *Rohm,* 274 id. 547; *Reynolds* v. *Wetzler,* 254 id. 607.)
Courts of equity accept with caution evidence offered in
support of a contract to make disposition of the property

of a deceased person different from that provided by law and will weigh such evidence scrupulously. (*Davier* v. *Kaiser, supra; Woods* v. *Evans,* 113 Ill. 186; *Wallace* v. *Rappleye,* 103 id. 229.) All of the authorities agree that in order to entitle a party to the specific performance of a contract for the conveyance of land resting in parol the contract must be certain and definite in its terms and must be established by evidence free from suspicion. *Mould* v. *Rohm, supra.*

We repeat that the existence of the written agreement to adopt in this case depends on the testimony of a brother of Charles Hutton. He does not claim to have read the contract or seen the signatures of the contracting parties. His only knowledge of the existence of the contract is his recollection of a conversation with one of the contracting parties which occurred more than twenty years ago. The terms of the contract were never stated to him. If the document exhibited to him was a receipt for the child and a pledge to bring it up in the Catholic faith and provide it with a good home it complied with the requirements of the institution. There is no competent evidence in the record that any agreement was required by the institution in 1882 when it placed children in private homes, but, if it be assumed that the same requirements existed then as exist now, the agreement required would not be an unconditional agreement to adopt a child. The records of the institution and the notation in the Hutton family Bible show that Charles was taken "to raise," but there is no indication in any of these records that the Huttons were obliged to adopt him. The testimony of the customers and the neighbors of John and Bridget Hutton concerning statements made by the Huttons in casual conversations with them is evidence of their intention to provide for Charles by adopting him or by conveying property to him but it is not sufficient to establish the existence of a binding agreement to adopt him. (*Pantel* v. *Bower,* 104 Kan. 18, 178 Pac. 241.) There is

evidence in the record that the Huttons furnished Charles' home when he married and that Mrs. Hutton conveyed to Charles in October, 1919, an improved lot in the city of Gillespie. At the time of Bridget's death her estate was worth about $30,000. There is some evidence that she prepared a will after the death of her husband and that Charles was named in the will as a beneficiary, but this will has not been found. The relations between the Huttons and their foster-son and their repeated statements of their high regard for him and their intention to make him their heir are inconsistent with their failure to take steps which would legally vest him with the title to their property. Notwithstanding this, the courts are without authority to declare the property vested in him without proof meeting the established standards in cases of this character. It is fundamental to the specific performance of a contract of adoption, where the writing relied upon as containing the contract is lost, that the evidence adduced to establish it must be clear and convincing in its probative force. In such cases the facts must be consistent not only with the performance of such a contract but must also be such that they cannot reasonably be harmonized with any other theory. (*Heath* v. *Cuppel*, 163 Wis. 62, 157 N. W. 527.) In this case all the competent evidence in the record is consistent with the existence of an agreement to adopt the child, but all the evidence is likewise reasonably harmonized with the theory that the child was taken from the orphans' home with the understanding that it should be brought up in the faith of the Catholic church, given an education and otherwise supported and maintained as a member of the Hutton family, in consideration of the child's rendering to the Huttons the service which he did render. The decree for specific performance cannot be sustained.

The decree of the circuit court is reversed and the cause is remanded, with directions to dismiss the bill.

*Reversed and remanded, with directions.*