(Nos. 18462-18463.—Decrees affirmed.)

EMMETT KELLER, Appellant, *vs.* HOPE JOSEPH *et al.* Appellees.—JOHN KELLER, Appellant, *vs.* HOPE JOSEPH *et al.* Appellees.

*Opinion filed February 24, 1928.*

1. TRUSTS—*mere refusal to carry out promise in regard to conveyance does not, in absence of fraud, give rise to trust.* Where a person procures the making of a gift directly to himself through false and fraudulent assurances that he will carry out a plan of the donor to apply the gift to the benefit of a third person who would otherwise have been the recipient of the gift, and thereafter refuses to carry out the promises, claiming to hold the property in his own right, equity will enforce the obligation by impressing a trust on the property in favor of the one who has been defrauded; but a mere denial by the holder of the legal title that a trust exists or the mere refusal to carry out a verbal promise does not constitute such fraud as takes the case out of the Statute of Frauds.

2. DEEDS—*statements of grantor after parting with title are not admissible against the grantee.* Where complainants allege that a certain conveyance was made to the grantee for their benefit and seek to enforce the alleged trust, statements of the grantor out of the presence of the grantee after he parted with his title are not admissible and cannot be used for the purpose of impairing the grantee's title.

3. SPECIFIC PERFORMANCE—*what part performance is necessary to take alleged agreement for conveyance out of Statute of Frauds.*

To take an alleged parol agreement for the conveyance of real estate out of the Statute of Frauds on account of part performance all acts performed thereunder must be referable to the contract, and it must be clear that the promisee went into possession under the contract and made valuable improvements on the property with his own means and upon the faith of the promise, especially where the agreement is between parent and child.

4. SAME—*evidence of parol agreement for conveyance must establish contract with certainty.* To take a contract for a conveyance out of the Statute of Frauds the evidence must be such as to establish with reasonable certainty the fact that the agreement was made and the terms of the agreement, and the mere expression of an intention to convey, which does not culminate in a binding agreement with mutual obligations, is not a contract which can be specifically enforced.

5. SAME—*evidence of disposition of property of deceased person will be carefully weighed.* Courts of equity accept with caution evidence offered in support of a contract to make disposition of the property of a deceased person different from that provided by law and will weigh such evidence scrupulously.

6. SAME—*what evidence does not imply a gift to complainants.* In a suit for specific performance of an alleged oral agreement of a parent to convey land to her two sons, evidence that she referred to a part of the land as "John's" and to another as "Emmett's" does not imply a gift of the property to them where they were in possession and farmed the two tracts, as it is not unusual for parents to refer to property by the name of the child who uses it, and such reference is no evidence of title in the child as against that of the parents.

APPEAL from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding.

LITSINGER, HEALY & REID, for appellants.

WILLIAM J. WELDON, JOHN B. BORDEN, and PINES, MORSE & STEIN, (CLARENCE T. MORSE, of counsel,) for appellees.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

John Keller and Emmett Keller each filed a bill in the circuit court of Cook county against their mother, Carrie Keller, alleging that she held certain described lands in trust

for them and praying that each be declared the owner of the tract claimed by him. Their bills were dismissed for want of equity and each has prosecuted an appeal to this court.

The pleadings in each case are substantially identical except that two different farms are involved. The cases were heard together before the master and before the circuit court and have been consolidated for hearing in this court. After the hearing before the master was concluded, and before the entry of the decree, Carrie Keller died intestate, and her daughter, Hope Joseph, was appointed administratrix of her estate. In the circuit court the LaGrange State Bank, as mortgagee, and John J. Kearney and Anton Buchas, as vendees under certain sales agreements, were interested parties, but the action of the circuit court in disposing of their interests is not questioned on this appeal.

In 1876, when William Keller, the father of appellants, married, he was the owner of an eighty-acre farm situated in Cook county, south of and adjacent to the Seventy-ninth street road and its intersection with the Willow Springs road, forty acres being on the east side and forty on the west side of the latter road. There was an eight-room house on the northwest corner of the east forty, and this house was occupied by William and Carrie until the former's death, May 18, 1915, and thereafter by the widow and three surviving children. The children were John, born in 1891, Emmett in 1896 and Hope in 1899. At different times William bought three tracts of land along the north bank of the DesPlaines river, about a mile south and east of the home farm, aggregating sixty acres. There were three or four cottages along the river bank which were leased by William to tenants. The land was rocky and subject to overflow and was used chiefly for pasture. In 1904 William bought from Letitia Gee a seventy-nine-acre farm about a mile south and a mile west of the home farm.

Shortly thereafter the house on this farm burned and the land was operated by William and his sons from the home farm. When William bought the Gee farm he told his family physician and several of his neighbors that he wanted the boys to be farmers and that he now had a farm for each of them; that he would give John the home farm and Emmett the Gee farm. The boys worked on the farms when they were not in school and were given to understand by the father that the farms would be theirs when they were old enough to take care of them. In June, 1911, William became ill and thought he was not going to get well. He sent John to Willow Springs to ask Henry Koller, a notary public, to come to the house to make some deeds. John and Emmett say that William said to John, "I will deed each of you boys a farm in your mother's name," but Carrie denies that he made that statement. Koller came and prepared deeds conveying all of William's lands to Carrie, and William executed these deeds and delivered them to her. Koller says that when William handed the deeds to Carrie he said, in substance: "I know you will take care of the children and will do the right thing by them; you will see that the boys will get what is coming to them." George F. Keller, a nephew of William, called while Koller was at the house. William told him that he had just made deeds conveying all his property to Carrie, and remarked that he thought there was enough to keep her as long as she lived. John was then twenty years old and Emmett fifteen. William never regained his health but he lived for four years after he executed and delivered the deeds to his wife. There was no change in the family relationship after the delivery of the deeds. All continued to live in the residence on the home farm and the boys performed the farm labor under the direction of their father. After the father's death the boys continued to operate the farms as before. In the fall of 1915 Carrie told the boys that she would take the proceeds for that year and thereafter they could have

the proceeds from the farms if they would pay the taxes and operating expenses. John and Emmett testify that in this conversation she said, "You can operate the farms as owners," but Carrie and Hope say that the word "owners" was not used. Thereafter the family relationship continued as before, the boys operating all the farms and the mother and daughter doing the housework. When William died he left about $5000 in cash, and Carrie used some of this in purchasing an additional forty acres of land adjoining the river land. In December, 1916, she sold the one hundred acres along the river for nearly $30,000. After that the family began to live better. A $1400 automobile was purchased and the residence was repaired, painted and re-decorated. Emmett wanted to be married and wanted his mother to build a house for him on the Gee farm and pay for a wedding trip. She refused to do either, and he left home in February, 1917, and took employment on a farm in Boone county. John remained at home and continued to operate both farms. There was no adjustment of property interests when Emmett left and no claim by him that he was entitled to a share of either the real or personal property. In September he was selected for military service and went to Camp Grant. In June, 1917, John was married and his wife came to live on the home farm. In November Hope was married and left the homestead. Emmett was married in December at Camp Grant. He was in the service two years, and when he was discharged, in September, 1919, he returned to the farm. He was wounded while in the service, and during his recuperation in the hospital his mother told him that when he was discharged from the service she would give him $4000 with which to build a house on the Gee farm. John's wife left the farm on two occasions and stayed away for several months. In November, 1919, John went to Willow Springs to live with his wife but continued to operate the farms with Emmett. Carrie bought John an automobile to use in going back

and forth to the farm. In the spring of 1920 construction of a house on the Gee farm was begun. An architect had been employed to draw the plans, and it was evident that the house planned would cost more than $4000. Carrie objected to the building of such a large house, but Emmett and his wife insisted on going ahead according to the architect's plans. The work was done by day labor, Carrie paying some of the bills and Emmett and his wife some. According to the records kept by Emmett's wife, Emmett paid out $3764.17 and his mother $6134.28. Emmett and his wife moved into the new house in the spring of 1922 and Carrie came to live with them in June. When she left the homestead John and his wife returned to it, and thereafter John operated the home farm and Emmett the Gee farm. In October, 1922, Carrie made a will, leaving the home farm to John and the Gee farm to Emmett. Apparently this will was destroyed by her. In the fall of 1923 Carrie sold thirty acres of the forty on which John's house stood, and to clear the title the three children and their spouses signed a quit-claim deed conveying the eighty acres to their mother. She received about $10,000 for the land and gave $3000 to John. She said she gave him this money for the purpose of repairing the house, adding some modern improvements thereto and otherwise improving the home farm. John says that she recognized the fact that the thirty acres belonged to him and gave him $3000, telling him she was keeping the other $7000 in trust for him. He also claims that he did not know the quit-claim deed covered more than the thirty acres. In 1924 Emmett bought eighty acres of land in DuPage county and Carrie advanced him $2000. Theretofore the mother had given Hope $4000 with which to buy a home. In December, 1924, Carrie left Emmett's home and went to live with Hope. Between 1922 and 1925 Emmett built a barn and other out-buildings, set out an orchard and put a new fence around the Gee farm. In November, 1924, Carrie borrowed $3000 from the La-

Grange State Bank, and in May, 1925, another $3000, securing both loans by trust deeds conveying the Gee farm. In August, 1925, she borrowed $5000 from the LaGrange State Bank and conveyed the west forty acres of the home farm as security. In November, 1925, she entered into a contract to sell to Buchas the Gee farm for $33,000 and the west forty acres of the home farm for $17,000. John and Emmett went to see the cashier of the LaGrange State Bank about these sales, and he told them their mother had consulted him about the details of the transaction but not about the advisability of making the sale. They complained that the price was too low, and he told them the land belonged to their mother and that she could do as she pleased with it. The cashier testifies that they did not say to him that they had any interest in the land, but they claim they called his attention to their right to the farms and that he told them to consult a lawyer. Hope says that Emmett complained to his mother about her sale of the Gee place after he had spent so much money on it, and that Carrie told him she was willing to return to him all the money he had invested. Hope says he made no claim that he owned the farm. A number of witnesses testify to conversations with Carrie in which she stated that she was holding the farms for the boys and referred to the home farm as John's and the Gee farm as Emmett's. She denied most of these conversations. She testified that all of the $50,000 which she secured from the sale of the river land and the thirty acres of the home farm and from the loans from the LaGrange State Bank was spent by her for the benefit of and at the request of the three children, and that most of it was spent on behalf of her sons.

The first contention of appellants is that their mother received the legal title to the farms claimed by them, to be held in trust for them, and they ask that a trust be declared. There is no evidence in the record to support this claim. William executed the deeds conveying the fee in

the lands to Carrie and delivered the deeds to her without condition or limitation. She did not seek to have the deeds made, nor did she make any promise to hold the lands for any particular purpose or to dispose of them in any particular manner. Undoubtedly, William intended that John should have the home farm and Emmett the Gee farm, and Carrie knew of and acquiesced in this plan. Notwithstanding this intention of the parents there was at no time an enforceable agreement by the father to convey the lands to his sons. Whenever a person procures the making of a gift directly to himself through false and fraudulent assurances that he will carry out a plan of the donor and will apply the gift to the benefit of a third person, who is the real object and who would otherwise have been the real recipient of the gift, and thereafter refuses to carry out the promises, claiming to hold the property in his own right, equity will enforce the obligation by impressing a trust on the property in favor of the one who has been defrauded. (*Stahl* v. *Stahl,* 214 Ill. 131.) But a mere denial by the holder of the legal title that a trust exists or the mere refusal to carry out a verbal promise does not constitute such fraud as takes the case out of the Statute of Frauds. (*Lantry* v. *Lantry,* 51 Ill. 458.) In order to raise a trust *ex maleficio* there must be an element of positive fraud in the transaction. (*Davis* v. *Stambaugh,* 163 Ill. 557; *Roche* v. *Roche,* 286 id. 336; *Streeter* v. *Gamble,* 298 id. 332.) Statements made by William out of the presence of Carrie after he had parted with his title to the farms were not admissible and cannot be used for the purpose of impairing her title. (*Ryder* v. *Ryder,* 244 Ill. 297.) The evidence does not support the claim that Carrie received and held these farms in trust for John and Emmett.

The principal contentions of appellants are, that they were told by their mother that they could have the farms if they would enter into possession of them and improve them, that they have carried out their part of the agreement, and

that they are entitled in equity to have a specific performance of the contract. The law in such cases is well settled. To take a parol agreement for the conveyance of real estate out of the Statute of Frauds on account of part performance all acts performed thereunder must be referable to the contract, and it must be clear that the promisee went into possession under the contract and made valuable improvements on the property with his own means and upon the faith of the promise; and this is particularly true where the agreement is one between parent and child. (*Stephens v. Collison,* 313 Ill. 365.) The mere expression of an intention to convey property which does not culminate in a binding agreement with mutual obligations is not a contract which can be specifically enforced. (*Cassel* v. *Cassel,* 104 Ill. 361.) In order to take the case out of the operation of the statute the evidence should be such as to establish with reasonable certainty the fact that the agreement was made and the terms of the agreement. Courts of equity accept with caution evidence offered in support of a contract to make disposition of the property of a deceased person different from that provided by law, and will weigh such evidence scrupulously. (*Hutton* v. *Busaytis,* 326 Ill. 453.) The only statement which appellants claim their mother made which approaches the dignity of an agreement is the one she made after their father's death, in the spring of 1915. John claims she said to them in the presence of their sister, "If you boys pay the taxes and operate these farms as owners, all I want is the proceeds of this year." Emmett says she said, "It was always your father's desire for you boys to stay home and work the farm; all I want is the proceeds of this year and after that you boys can operate the farms as owners." After this statement was made there was no change in the family relationship. The boys continued to operate the farms jointly and they continued to reside in the homestead with their mother and sister. The mother paid the household bills from funds of

the estate and they kept the proceeds from the farms. When she sold the river land she used the funds for the joint benefit of the family. When the boys needed extra money for improvements on the farm she provided it. Emmett left the farm in the spring of 1917 and made no claim that he was the owner of the Gee farm. All the money that was spent by John in improving the home place was furnished by his mother, and most of the money spent by Emmett came from the same source. Emmett's wife was a school teacher, and money received by her from that source and money received by Emmett from the government went into the new home on the Gee farm. The mother told Emmett, in the presence of Hope, that she was willing to reimburse him for money spent by him and his wife in improving the Gee farm, and if he has a claim against the estate it can, no doubt, be adjusted in the probate court. When the mother sold a part of the home farm both appellants joined in a quit-claim deed to her, thereby recognizing her title. The fact that she referred to the home farm as John's and to the Gee farm as Emmett's does not imply a gift of the property to them. It is not unusual for parents to refer to a house or an article of personal property by the name of the child who uses it, as a mode of distinguishing the rights which the parents have allotted to the child as against its brothers and sisters, but such reference is no evidence of title in the child as against that of the parents. (*Geer* v. *Goudy*, 174 Ill. 514.) All the evidence considered, we are satisfied that no contract has been established by that quality and quantity of evidence which will remove it from the operation of the Statute of Frauds.

The decree of the circuit court in each case is affirmed.

*Decrees affirmed.*