CRILLY et al., Respondent v. MORRIS et al., Appellants.

(19 N. W.2d 836.)

File No. 8684. Opinion filed September 12, 1945.

See also 70 S. D. 153, 15 N. W.2d 742.

**T. B. Thorson,** of Rapid City, and **Percy Helm,** of Sturgis, for defendants and Appellants.

**Whiting & Wilson** and **H. F. Fellows,** all of Rapid City, for plaintiffs and Respondents.

**Thomas G. Wall,** of Sturgis, for intervening plaintiff and Respondent.

SMITH, P.J. Joanna Held died intestate without issue in May 1941. · She had formerly owned a residence and its furnishings in Rapid City, South Dakota, and an eight hundred acre ranch a short distance from that city. After her death the defendant Isaac A. Morris claimed title to the residence and its furnishings under a bill of sale and a deed from the deceased dated October 29, 1935, and to an acreage of the ranch under a deed from deceased dated March 22, 1938, and the defendant S. Fred Morris claimed title to the remainder of the ranch under a deed from the deceased dated March 22, 1938. This action was commenced by the administrator of the estate of Joanna Held, deceased. The complaint avers that the above described transfers were void for the reason, among others, that they were not delivered. Thereafter Clara Held Reid was permitted to intervene. By her complaint in intervention she joined in the allegations of the complaint of the administrator, and asserted an equitable claim to the property of the deceased under an alleged contract made for her benefit during her infancy between her father, on the one part, and Joanna Held and her late husband, E. F. Held, on the other part, wherein Mr. and Mrs. Held agreed to adopt the intervenor and to make her their sole·heir. Subsequently, one Margaret Riethmann was added as a party plaintiff. The order adding this plaintiff discloses that the defendants' and Margaret Riethmann's names appeared upon the list of heirs of Joanna Held in the probate proceeding and it provided that Margaret Riethmann should represent the interests of all of the heirs of Joanna Held, excepting the defendants. The answers of the defendants asserted title to the property under the described transfers, and the answers of the plaintiffs and of the de-

fendants to the complaint in intervention denied that Joanna Held and E. F. Held had agreed to adopt the intervenor, or to make her their sole heir. The issues were tried to the court and were resolved in favor of the intervenor. After the court had announced its decision, it was disclosed that subsequent to the commencement of the action, the plaintiff Margaret Riethmann and the intervenor, Clara Held Reid, had entered into an agreement to share in the property in the event that either should prevail in the litigation and the court entered judgment accordingly. See State ex rel. Reid v. Circuit Court S. D. 286, 9 N. W.2d 699. The defendants have appealed from the judgment so entered.

The principal contention of the defendants is that the trial court arbitrarily disbelieved and disregarded uncontradicted tesimony of the defendants and of Pearl Morris, the wife of S. Fred Morris, in finding that the bill of sale was forged and that the described deeds and bill of sale were never delivered. We are not required to speculate as to the reasons which prompted the trial court in directing counsel to prepare "a specific finding that the testimony of Pearl, Fred, and Isaac Morris is not worthy of credit, and is not believed and that such witnesses are by all of the evidence proven to have no credibility." To reveal the reasoning of the trial court, we quote at length from its memorandum decision:

"Before approaching the evidence on the question of the claimed delivery of these conveyances it seems necessary to consider the relationship of the several parties concerned in this proceeding. The evidence discloses that Joanna Held, the grantor, was at the time of her death in May 1941, the widow of E. F. (Fritz) Held, who preceded her in death in 1929. The Helds had for many years lived in lower Rapid Valley in Pennington County and were engaged in ranching. . They were successful and prosperous and accumulated a large amount of land, some of which was under irrigation and highly productive and the balance "dry land", and were people of standing in the community. They were childless, but in '97 or '98, they took intervenor, then about three years old, into their home where she lived as their daughter until 1913.

"Up until 1928 or '29, Fritz Held operated the ranch personally with hired help or thru tenants, living there or in Rapid City. In 1927, or thereabouts, he became ill and spent a few months at the Chamberlain sanitarium taking medical treatments. Shortly after his return to the ranch he displayed evidences of mental disorder, evincing a marked antipathy for Isaac Morris, one of the defendants, who was at the time employed on the ranch and a frequent visitor at the home in town. Whether Fritz Held's animosity toward Isaac was prompted by the mental derangement which resulted in his being later committed to the State Insane Asylum, or whether it had some basis in fact, is not established, but that it existed is certain. He told a neighbor, Walter Taylor, that Isaac was interfering in his family affairs and Taylor, who is decidedly a man of parts and possessed of unusually acute perceptions and good sense, advised Mrs. Held to get rid of Isaac, which however, she declined to do. This incident is mentioned not as a finding that at this early date, Isaac was in fact guilty of any interference with Fritz Held's family affairs, but only as it seems to mark the first advent of this defendant into the immediate affairs of Joanna Held.

"In 1929, Fritz Held was adjudged insane and committed to the Asylum where he shortly died. Prior to this, in 1927, he had conveyed all his real estate and personal property to his wife, Joanna, and in 1929 after her husband had been sent to Yankton, Mrs. Held leased the ranch to either the defendant, Fred, or to Fred and Isaac, depending on the form of Exhibit '1' (the lease) at the time of its signature by Mrs. Held. Further attention to this instrument will be given later in this opinion.

"Under this lease (Exhibit '1'), the defendants, Fred and Isaac Morris and Fred's wife, Pearl Roberts Morris, occupied and operated the ranch until the death of Joanna Held in 1941. * * *

"During all the period of their occupancy of this ranch, the relations existing between the Morris family and Mrs. Held were extremely cordial and friendly with marked attention and apparent devotion to Mrs. Held and her interests on the part of the Morrises. They visited her two or three

times a week and brought her provisions from the ranch. Much of the time Isaac lived with her at her home in town, mowing the lawn, shingling the house, cooking meals and occasionally driving her about in his automobile. He was unmarried and apparently without other occupation than what work he did at irregular times on the ranch. That his attentions were welcome and highly appreciated by his Aunt, Mrs. Held, seems clearly evident from complimentary remarks about him made by her to her friends; and his brother Fred was likewise in high favor, eclipsed in the aunt's regard, only by Ike. * * *

"The Morris family, both before and after her death, had access to grantor's safety deposit box as well as to letters and papers, which were kept in a bookcase in her house.

"While there is much testimony as to how Mrs. Held desired to dispose of her property at her death as well as to high esteen in which she held the Morris boys and as to the where Clara Reid stood in her estimation, I deem none of it as of any great importance. There is no testimony which directly explains why she made out these deeds and this bill of sale, or why the bill of sale and the deed to Isaac Morris are dated October 29th, 1935, while the two deeds to Fred bear date of March 22nd, 1938. There is no expert testimony as to either the typing or the handwriting on these instruments or on Exhibit '1', but it does appear evident to me that the signature 'Joanna Held' appearing on Exhibit '2', the bill of sale, is not the signature of Mrs. Held, but is a tracing of a pencilled signature with the pencil marks erased. Made as it was on the same date as Exhibit '3', which was prepared by and acknowledged before C. E. Feigel as a notary, the ink is different, or if the same, is fresher than in the signature on the latter and I consider it a forgery.

"These I consider to be the principal events and the more important facts necessary to a clear comprehension of the relationship of the parties to this suit as it existed in the fall of 1939, when Pearl Morris says these deeds and the bill of sale were delivered to her by Joanna Held.

"Her testimony, if true, establishes a legally sufficient manual delivery by Mrs. Held of these conveyances, and

her testimony as to what transpired between her and the grantor is not controverted or denied from the lips of any witness. No one else was present but Joanna Held and Pearl Roberts Morris, and Joanna Held's lips are sealed in death.

"She says that Joanna Held at her home in Rapid City handed her a sealed envelope (Exhibit 'F') on which appeared in Mrs. Held's handwriting, the words 'To Fred and Isaac Morris' and told her what was contained therein and for her to deliver it to the 'boys', but for them not to record the deeds until after her death. At the same time she also handed her another envelope containing Exhibits 'A', 'B', 'C', 'D', 'E', telling her in detail their history and stating that she might need them some day. These exhibits were respectively (1) a scrap of paper signed by Ethel Speer which had been given by the latter to Fritz Held and which read 'I will take care of you all your life and Aunt Anna, too'; (2) a postcard written by Mrs. Held to Clara Held in 1911; (3) a check stub evidencing a payment of money presumably for the benefit of Clara Held Reid and her husband; (4) two letters from Clara Held Reid asking for money.

"Mrs. Morris says that she took both envelopes home with her and handed the one containing the conveyances to the defendants, who then returned it to her unopened. That she retained possession of it, unopened, until a time she went to a hospital when she handed it to Isaac, still unopened.

"Analyzing Mrs. Morris' testimony we note that the directions given her respecting the delivery of the envelope and its contents did not require that she withhold delivery until after grantor's death because it was only the recording which was to be deferred. Thus, there was no reason for not opening the envelope and examining the contents, and, if her testimony is true it is quite remarkable that no one of the three Morrises opened it for period of one and one-half years.

"The fact that the deeds were enclosed in a sealed envelope addressed to the grantees likewise seems inconsistent with the circumstances of the delivery as testified to by her, being rather the method used for a posthumous

transfer of property than one such as related by this witness.

"That grantor would use this witness as a medium thru whom to transmit these conveyances to the defendants instead of handing them directly to the grantees, or one of them, also seems improbable in view of the fact that Isaac slept and ate in the house and spent most of his time there and that Fred was there two or three times a week. It was the grantees who were her nephews and the object of her favor, and not Mrs. Morris. The conveyances represented a very valuable gift to the defendants and it would be only natural that in giving it the Aunt would wish to make a ceremony of presenting it directly to the objects of her bounty and receiving some outward expression of their gratitude. And in this connection it is passing strange that there is not one word of evidence from either the grantees or Pearl Morris that any of them either thanked Joanna Held for the conveyances or even mentioned to her that they had been delivered. This again is not in accord with ordinary human conduct.

"These observations to be sure, relate only to the improbability of the truth of her testimony as judged by what would be done by the average person under like circumstances and do not amount to a direct impeachment of this witness. But there is such an impeachment notwithstanding, and it is a serious one, not alone by one witness, but by two of them, both as equally interested in the outcome of this case as is this witness and as likely to know the facts. They too testify as to Exhibits 'A', 'B', 'D' and 'E' and while Pearl Morris says that these Exhibits were discussed by herself and the grantor and handed to her at the same time the envelope with the conveyances therein was delivered to her, both Fred and Isaac Morris aver that they were found in Mrs. Held's private papers after her death and thus came into their possession. And this again meets the test of reasonableness and natural human conduct. Why should Joanna Held pick out these entirely worthless papers and solemnly pass them on to Pearl Morris along with these deeds, if the latter's testimony is to be believed? The inescapable conclusion is that she did not.

"If Mrs. Held did not deliver them to Pearl Morris they were at her death either in her safe deposit box or among the papers which she kept at the house; and the defendants and this witness had free access to them in either case. A much different situation then exists than if there were no means of acquiring their possession than thru a delivery by grantor.

"The whole inquiry then boils down to a test of the credibility of Pearl Roberts Morris and the rule is well settled that where an unimpeached witness testifies distinctly and positively to a fact and is uncontradicted, but the statements of the witness are grossly improbable or he has an interest in the question at issue, Courts are not bound to blindly adopt the statements of such witness.

"Blount v. Medbery, 16 S. D. 562, 94 N. W. 428; McGill v. Young, 16 S. D. 360, 92 N. W. 1066; Union Nat. Bank v. Mailloux, 27 S. D. 543, 132 N. W. 168; Hudson v. Sheafe, 41 S. D. 475, 171 N. W. 320; Jerke v. Delmont State Bank, 51 S. D. 623, 216 N. W. 362, on rehearing 54 S. D. 446, 223 N. W. 585, at page 594, 72 A. L. R. 7; Quock Ting v. United States, 140 U. S. 417, 11 S. Ct. 733, 851, 35 L. Ed. 501; Yeager v. Chicago, R. I. & P. R. Co., 148 Iowa 231, 123 N. W. 974; Logue v. Grand Trunk Ry. Co., 102 Me. 34, 65 A. 522; Anderson v. Liljengren, 50 Minn. 3, 52 N. W. 219; Elwood v. Western Union Tel. Co., 45 N. Y. 549, 6 Am. Rep. 140; Keene v. Behan, 40 Wash. 505, 82 P. 884; Gosline v. Dryfoos, 45 Wash. 396, 88 P. 634; Atlantic Works v. Brady, 107 U. S. 192, 2 S. Ct. 225, 27 L. Ed. 438; Leavitt v. Thurston, 38 Utah 351, 113 P. 77; Sonoma County v. Stofen, 125 Cal. 32, 57 P. 681. * * *

"It is of course possible that Fred and Isaac Morris are mistaken about Exhibits 'A', 'B', 'C', 'D' and 'E' and that the statement of Pearl Morris is true. Whether these were delivered at the same time as the deeds is important only as it affects the credibility of this witness upon whose testimony alone depends the effectiveness of these deeds to pass the title to property which would make her, as the wife of one of the grantees, financially independent. If she had no interest one way or another in the delivery or any connection therewith, except as an escrow agent, her testimony

might well be accepted as true notwithstanding its inherent improbabilities and inconsistencies. But she does have an interest.

"As the wife of Fred Morris and the sister-in-law of Isaac, she has lived with them on the ranch since 1929 where she has kept the books, settled the accounts, paid out the money and in general acted as a manager of ranch affairs. She was a witness to the lease (Exhibit '1') and, according to her husband's testimony, took part in its preparation; and it was she who in August 1931 filed it for record with the Register of Deeds, thereby proclaiming to the world that it was a valid document. Since she had the custody of the business records it is likely that she had possession of this Exhibit from the time it was executed in 1929. Either as witness or custodian she would have knowledge of any addition or alteration therein which was made subsequent to its execution.

"The instrument as originally prepared in her presence, was in the form of a lease to the ranch property between Joanna Held and Fred Morris. It was prepared by Carrie Feigel and witnessed by her and Mrs. Morris. As it now appears it bears the imprint of three separate typewriters and the additions made with the last two have grafted onto the original lease a contract for the sale of both the ranch and the residence in town.

"After the form had passed thru the first machine and been turned over and the acknowledgment written on the reverse side, it was placed in a second machine having a different type, and the description of the town property inserted in two different places, one near the beginning and one near the end. The date line was then filled out, but altho Exhibit '1' is a carbon impression the date line is printed direct from the ribbon. It was then placed in a third machine and two other important additions made, the first being the insertion of the name 'Isaac Morris' as a party of the second part, while the second was the phrase 'Net proceeds from said sale as payment each year on purchase—until my death."

"The resulting instrument is a contractual monstrosity. If it was prepared by Miss Feigel on three separate typewri-

ters and in its present form all at one sitting, which Fred
and Isaac depose to be the fact, she lacks the business judg-
ment and office experience which one would expect her to
have as a former Deputy Register of Deeds and an ab-
stracter, but it is a severe tax on the Court's credulity to
believe she did. It seems even more improbable that Mrs.
Held, who was a woman of much more than average intelli-
gence and education, would sign such an instrument and
lease the home in town where she then resided and where
she continued to reside for years afterward, to the tenant on
her farm. It is as equally improbable that she would sign
an agreement to sell her farm of 847 acres for $10,000.00 or
permit the $20,000.00 consideration for the 314 acres to be
entirely stricken out, and it is even more improbable that,
unwilling as she apparently was, to bind herself to rent the
land for a fixed term of more than one year with an option
to purchase it for what she had originally expressed as a
price of $30,000.00 for the land alone, she would finally con-
sent to have $20,000.00 eliminated from her first opinion
of its value and then gratuitously throw in a house worth
perhaps $5000.00 and finally obligate herself to sell it and
require no greater consideration for all of it than the going
rental of one-third of the crop for the term of her life, which
of course meant a free gift of both the farm and the house.
I am certain that in its present form Mrs. Held would not
have signed it and am as well convinced that she did not. As
originally drawn and signed by her it was all written on the
first typewritter; and, as the color of the ink discloses, was
not signed by Isaac until later and then with a different pen
than was used by the other signers. Nor was his name
typed therein as grantee. If Carrie Feigel ever prepared this
hybrid document she could never have forgotten it as long
as she lived.

"The Exhibit is a forgery and a fraud and since it could
serve no other purpose than as a crutch to support these
conveyances we are, I think, entitled to assume that the
alterations and additions to the original lease were made in
an attempt to strengthen the claim made by the Morris
brothers in the probate proceeding that they had purchased
the property. For Pearl Morris to cause this false document

to be recorded is as great a reflection on her veracity as tho she had testified to the facts therein contained, and this without regard to who was the forger.

"I have discussed this exhibit and the conclusions which must be drawn from it as going to the credibility of Pearl Morris and the faith and credit to be given her testimony in this case. In the light of all the testimony, facts and circumstances proven in evidence here, and in particular as it relates to Exhibit '1', her testimony regarding the delivery of these conveyances is not entitled to and is not by this Court accorded any credence and this is likewise true as to the testimony of the defendants, both of whom by their claim that Exhibit '1' was in its present form on the day of its execution, have forfeited their right to be believed as witnesses.

"The subsequent additions to Exhibit '1' must have been made with their knowledge, as well as that of Pearl, if they did not actually make them for it was they who produced this exhibit in Court and it was they who even after Mrs. Held's death, caused additional revenue stamps to be affixed to the deeds in a plain attempt to make it appear that the consideration was $10,000.00 and thus correspond to Exhibit '1'.

"While the burden of proof was on the plaintiffs in the first instance to come forward with proof of the non-delivery of these conveyances since the presumption arising from their possession by the defendants was that they were lawfully delivered by the grantor, Wolf v. Wolf, 59 S. D. 418, 240 N. W. 349; Ansted v. Grieve, 57 S. D. 215, 231 N. W. 912, this presumption ceased to exist at the moment the evidence disclosed that no direct delivery to the grantee was made by the grantor. There then being no legal presumption of delivery, the burden is upon the defendants to prove such delivery by a preponderance of evidence. This they have failed to do. Lewis v. Tinsley, 66 S. D. 648, 287 N. W. 507, 124 A. L. R. 459."

The principles of law enunciated by the learned trial court in the foregoing opinion have been settled by the cited cases from this jurisdiction. We adopt the legal conclusions therein expressed. After a painstaking review of

the record as a whole, we have concluded that the facts and circumstances described by the trial court, and other matters we have noted in the course of our examination, supplied the trier of the facts, whose function it is to pass upon the credibility of witnesses, with a premise for a rational conclusion that the testimony of the defendants and Pearl Morris should not be believed. See Jerke v. Delmont State Bank, supra. It follows that we are not at liberty to disturb the finding ·that the described transfers were not delivered.

█ In connection with the contention just considered the defendants complain of specific rulings of the trial court excluding testimony. In the absence of an offer of proof, we find it impossible to determine whether the defendants were in fact prejudiced by these rulings.

The defendants make the further contention that the evidence is insufficient to support the finding of the trial court that Joanna Held orally agreed to adopt Clara Held Reid. The alleged contract was made in about 1898 and the parties thereto are dead. The finding rests on circumstantial evidence.

The mother of Clara Held Reid died when Clara was an infant of eighteen months. She was the youngest of a family of several children. For a part of the time thereafter she was cared for in the nearby home of her aunt. The Helds, who were childless and wanted children, then lived on their ranch. They finally took Clara into their home when she was about the age of three years. Before they were permitted to take her, they came to the family home in Rapid City more than once. During that period the father advised with the older children and with his business partner about the wisdom of "adopting Clara to the Helds." After the Helds had possession of the child, they called with her at the home of a sister of Clara's mother. While there, in the presence of Mr. Held, Joanna Held said in substance that the papers were all made out, Clara would be theirs from then on, and no one could take her from them. A short time thereafter Mr. Held stated to a third person that he had adopted the little girl and she would be his sole heir. Some years later Mr. Held proposed adoption to Clara's

brother. He asked the boy if he would like to be adopted the same as Clara and have equal rights with her.

From the time the child entered the Held home she was known as Clara Held and was spoken of as their daughter. She did not come to realize that they were not her natural parents until she was nine years old. Prior to that time, because of the distance to the country school, Mrs. Held, who had been a teacher, attended to her education. At that age she was enrolled in the school as their daughter. Shortly thereafter the school children told her she no right to the name Clara Held. She took her troubles to Joanna Held and was told to pay no attention to the matter as she was adopted and had every right to that name. Shortly after this incident, a man came to the Held home on business with Mr. Held. After he had gone they told Clara he was her father. Clara testified she did not know that she was not in fact adopted until after the death of Joanna Held.

From these early years down to the time of her marriage, Clara's life with the Helds was no different from that of a natural daughter. She was enrolled in other schools as their daughter, had a special "blue room" in their home, went on trips with them, and lived the normal life of an affectionate daughter in the home of equally affectionate parents. She enjoyed the benefits of that relationship and on the other hand did her full part as a member of the family; she shared in the family work as well as in its pleasure. A notable circumstance of this whole period is that although her own family lived in the same vicinity, she had almost no associations with them. Her father lived until long after Clara was married.

When Clara was nearing seventeen, Mr. Reid was brought to the ranch by Mr. Held and introduced by him to his wife and daughter. The young folks were married with the consent of the Helds when Clara was about eighteen. Mr. Held went with Reid to secure the marriage license and signed the required consent as the father of Clara. The Helds sent out announcements of the marriage of their daughter Clara and stood up with her at the wedding, and Mrs. Held supplied the Rapid City paper with the material for a story describing the wedding of the daughter of Mr.

and Mrs. E. F. Held. It was not until after the engagement that the Helds told Mr. Reid that Clara was their adopted daughter. In preparation for the wedding Mrs. Held paid Clara's own sister, who had become a seamstress, to sew for Clara.

For two or three seasons the Reids operated the ranch and the Helds lived in their Rapid City home. Because work in the irrigated fields had an adverse effect on Mr. Reid's health they left the ranch by mutual agreement. Mr. Held said at that time it would make no difference as they would have the property anyway. From this time forward a change took place in the relations of the Helds and the Reids. The Reids operated sheep ranches at a distance of from fifty to one hundred miles from the Helds. Correspondence was more or less regular, but visits were not too frequent. Ten children were born to the Reids. The Helds spoke of these children as their grandchildren, and the children called Joanna Held "Grandma." The eldest Reid daughter spent considerable time in the Held home and was the favorite of Joanna. Christmas and birthday gifts were made by Mrs. Held to the family down to the time of her death. The Reids, however, became desperately poor and suffered severe hardships during the extended period of drouth in that section of the country. The story of those hard days is told in Clara's letters which Mrs. Held saved. On the other hand, Mr. Held failed mentally and died in an institution, and Mrs. Held experienced some troubled years. The notable circumstance is that the reaction of the Helds, on the one hand, to the hardships of the Reids, and that of the Reids to troubles of the Helds, was not entirely in keeping with the strong bond of affection which seemingly existed between them during former years. The inference is, we think, fairly warranted that a large family and utter want chained the Reids to their ranch. The attitude of Joanna Held towards the Reids during those years is somewhat paradoxical. She carried on an affectionate correspondence, signed "Mamma" and "Grandma", but did little to relieve the stark misery Clara's letters described.

The defendants operated the Held ranch from about the time Mr. Held's mind failed. They made their home there

after 1928 and Isaac had the "blue room" in the Rapid City home and spent considerable time with Joanna. It is undisputed that Mrs. Held became very much attached to Isaac Morris and was very grateful to both of the boys and to Pearl Morris for their help and kindness throughout these years. During the last years of her life she repeatedly told others that she intended that Isaac and Fred should have the ranch and that Isaac should have the Rapid City home. The record fairly reveals that the defendants occupied first place in the affections of Joanna Held during her last days.

It is significant, we think, that although defendants attended the above-mentioned country school with Clara, and had lived in the vicinity and in more or less close association with Joanna Held, their aunt, all through the described years, they were unable to adduce testimony which weakens the strength of circumstances evidence by the intervenor. They did evidence declarations made by Joanna Held during her last years by two witnesses. One of these witnesses testified that Joanna had said that she had done enough for Clara, and the other that she had said she had not adopted Clara and never intended to.

We believe the foregoing is a fair outline of the circumstances revealed by the one thousand pages of testimony.

██ In Rhode v. Farup, 67 S. D. 437, 293 N. W. 632, and in Walsh v. Fitzgerald, 67 S. D. 623, 297 N. W. 675, this court reaffirmed its adherence to the rule that one claiming the benefit of an alleged contract for adoption has the burden of establishing it by evidence so clear, cogent and convincing as to leave no reasonable doubt as to the agreement. The cases from other jurisdictions are collected in 27 A. L. R. 1350 and 142 A. L. R. 102.

But this stringent rule by which the sufficiency of the evidence supporting the claims of such a litigant must be tested does not require direct evidence of the agreement. It may be established by circumstantial evidence. Roberts v. Roberts, 8 Cir., 223 F. 775, 138 C. C. A. 102; Niehaus v. Madden, 348 Mo. 770, 155 S. W.2d 141; In re Firle, 197 Minn. 1, 265 N. W. 818; Hickox v. Johnston, 113 Kan. 99, 213 P. 1060, 27 A. L. R. 1322; Hutton v. Busaytis, 326 Ill. 453, 158 N. E. 156; Edson v. Parsons, 155 N. Y. 555, 50 N. E. 265; In

re Garcia's Estate, 45 N. M. 8, 107 P.2d 866. Were it not so, this rule, which was devised to discourage a class of fraudulent claims, would frequently render the courts impotent in the face of a different character of fraud. The real basis of the remedy afforded the beneficiary of an unperformed contract of adoption "is equity's power and strong inclination to prevent a species of fraud." Woolley v. Shell Petroleum Corporation, 39 N. M. 256, 45 P.2d 927, 934. It will often happen that the only evidence available to the beneficiary of the existence of such a contract will be circumstantial in character. This was pointed out in Roberts v. Roberts, supra [223 F. 776, 138 C. C. A. 102]. There it was written:

"The argument by which we are asked to reverse the decree is that there was no direct and clear evidence of an agreement to adopt at the time Myra J. Roberts was received into the family of Charles J. Roberts. There is good reason why such evidence is wanting. All of the parties to the transaction are dead, and Myra J. Roberts was herself a babe at the time of the adoption. It seems to us that in such a case it is not necessary that the court first have direct proof of the making of the contract, and then proceed forward from the contract thus established to the conduct evidencing its existence. We think it is possible to reverse that process, and if the statements and conduct of the adopting parents are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence."

Needless to say, the circumstances which will warrant such an inference must not only be consistent with the existence of the contract of adoption but must be inconsistent with any other rational theory. Erickson v. Todd, 62 S. D. 280, 252 N. W. 879.

The circumstances revealed by this record meet the test of Rhode v. Farup and that of Erickson v. Todd, supra. They need not be re-discussed in detail. The statements and conduct of both families at the time and down through the years leave no room for reasonable doubt. The circumstances are not only consistent with the existence of

the contract, they are wholly inconsistent with any other theory.

■ Had the Helds performed their agreement, the status of Clara would have been fixed by Section 2629, C. L. of 1887 reading in part as follows:

"After adoption, the two shall sustain towards each other the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation."

See Quinn v. Quinn, 5 S. D. 328, 329, 58 N. W. 808, 49 Am. St. Rep. 875; Calhoun v. Bryant, 28 S. D. 266, 133 N. W. 266. Through application of the ancient maxim, the learned trial court rightly held that Clara Held Reid, in the eyes of equity, occupies that relation or status.

■ Because it is so stoutly urged throughout the brief of the defendants, another matter should receive consideration. As indicated supra, although the plaintiffs and the intervenor were opposed as adverse parties on the issue just considered, they reached an agreement during the course of the litigation to share in the property in the event that either should prevail. It is asserted that this agreement was unknown to the court and counsel until the court had announced its decision, and that the counsel for the plaintiff Riethmann, to the prejudice of defendants, made use of the privilege of cross-examination of the intervenor's witnesses to strengthen the case of Clara Held Reid. A motion for a new trial was not made; this appeal is from the judgment; and hence irregularities of the adverse party which prevent defendants from having a fair trial are not presented for review by this record. SDC 33.1605 and 33.1606; Keyes v. Baskerville, 42 S. D. 381, 175 N. W. 874; and Tufty, Adm'r, v. Sioux Transit Co., 70 S. D. 352, 17 N. W.2d 700.

Finding no prejudicial error in the record, the judgment of the trial court is affirmed.

POLLEY, ROBERTS, and RUDOLPH, JJ., concur.

SICKEL, J., (dissenting).

The majority opinion holds that the conveyances made by decedent to defendants are void, and with that part of the opinion I agree. On the question of adoption I believe

the opinion goes too far in applying the rule of circumstantial evidence to this class of cases.

The circuit court found:

"That a short time after the death of Clara's mother, her father and the Helds entered into an oral contract by the terms of which Alex Linton agreed to relinquish any further right to Clara and to give her to the Helds, who agreed to adopt her as their daughter and to treat and consider her as though she were their natural child, not having children of their own."

The right of intervenor to inherit the estate of Joanna Held, deceased, depends on the sufficiency of the evidence to justify this finding.

It is generally accepted as a rule that where a contract of adoption is made on behalf of a child, by its parents or by some other person having its control and custody, whereby parental rights are relinquished and the child is reared by foster parents, and where the child renders to the foster parents all the duties and services of a natural child until majority, the child acquires the property rights given by statute to an adopted child. These property rights include the right of inheritance in the absence of a will.

When the alleged contract is oral, the evidence of it must be clear, cogent and convincing, so far as to leave no reasonable doubt about it. Evidence of the relinquishment of parental rights; the performance of duties and services of a natural child; the fact that the child was given the care and affection of a natural child in return for its companionship and affection; that it was educated; that its name was changed; statements of intention or desire to adopt, or other conduct, acts or admissions of the parties are admissible as material circumstances which may be considered in corroboration of direct evidence of an agreement to adopt. However, none of these circumstances, nor any combination of them, is sufficient, by itself, to prove the contract. Clemons v. Clemons, 193 Okl. 412, 145 P.2d 928; Heath v. Cuppel, 163 Wis. 62, 157 N. W. 527; In re Norman's Estate, 209 Minn. 19, 295 N. W. 63; Benjamin v. Cronan, 338 Mo. 1177, 93 S. W.2d 975; Stillman v. Austin, Mo. Sup., 148 S. W.2d 573; Taylor v. Coberly, 327 Mo. 940, 38 S. W.2d 1055;

Thorton v. Miller, Mo. Sup., 151 S. W.2d 1101; Neihaus v. Madden, 348 Mo. 770, 155 S. W.2d 141; Pemberton v. Pemberton, 76 Neb. 669, 107 N. W. 996; Hutton v. Busaytis, 326 Ill. 453, 158 N. E. 156; Pantel v. Bower, 104 Kan. 18, 178 P. 241; In re Candelaria's Estate, 41 N. M. 211, 212, 67 P.2d 235; Mahaney v. Carr, 175 N. Y. 454, 67 N. E. 903; Hamlin v. Stevens, 177 N. Y. 39, 69 N. E. 118; Middleworth v. Ordway, 191 N. Y. 404, 84 N. E. 291.

In the case of Clemons v. Clemons, supra, this question was considered. Plaintiff claimed that the "Contract of adoption may be shown by conduct, acts, and admissions of the parties." The court said [193 Okl. 412, 145 P.2d 929]:

"The authorities cited support the general propositions advanced by the plaintiff, but they have only a limited application to the issue which this appeal presents for determination, * * *. As pointed out above the issue involved in the trial court was whether Leon H. Clemons had ever contracted to adopt plaintiff as his child. * * * If a contract for the adoption of the plaintiff had been made by Leon H. Clemons in his lifetime, then undoubtedly the plaintiff would have been entitled to maintain an action to enforce it. Eggstaff v. Phelps, supra [99 Okla. 54 226 P. 82]. The existence of the contract for adoption, however, was the sine qua non without which plaintiff could not prevail and with respect to which she was required to produce clear, cogent and convincing evidence." Authorities cited.

In that case the plaintiff tried to establish the contract by evidence that Clemons was thinking some of adopting plaintiff at a subsequent date; that the child's father told Clemons he was agreeable to such adoption and would do anything necessary to cooperate; that the child was taken into the Clemons home when it was about a month old; that there was no agreement between the parties as to how long she should remain or what her status should be; that she was given all the care, attention and affection which a child of the Clemons could receive as long as Clemons and his wife lived; that Clemons said that while at one time he had thought of adopting plaintiff he later decided not to do so. The court then said:

"This evidence falls far short of creating a contract of any kind and more particularly a contract on the part of Leon H. Clemons to adopt the plaintiff and to make her his heir. * * * Plaintiff also seeks to invoke the rule that where a child has been taken into a home and treated as a member of the family that this may be considered as evidence of a contract to adopt the child. Some of the cases cited upon casual reading would seem to lend credence to this view. However, a careful examination thereof will disclose that they rather involve the sufficiency of the evidence to support a contract shown to exist rather than to make a contract where none existed nor was intended. * * * The fact that a man has taken a child into his home and has bestowed upon such child the care and affection which he would ordinarily give a child of his own does not compel such individual to adopt such child or to make it his heir."

The court held that the evidence was insufficient to show plaintiff's claim.

The same question was before the Supreme Court of Wisconsin in Heath v. Cuppel, 163 Wis. 62, 157 N. W. 527, 528. That was an action brought by plaintiff against the estate of Charles Cuppel, deceased, for specific performance of a contract of adoption claiming to have been made by decedent. Plaintiff's evidence showed that decedent wrote the person with whom the child was living stating that the plaintiff's mother, then the wife of decedent, would call for the child and bring him to Milwaukee and that decedent would adopt plaintiff as his son. The letter was lost or destroyed. Plaintiff was taken to and lived at the Cuppel home as one of the family. He took the name of Cuppel. He was supported, sent to school and worked on the farm. Relations became estranged, and at the age of twenty-two the plaintiff left, married, raised a family, lost his home and with the aid of decedent returned to the Cuppel home with his family. There he was furnished with a house, necessaries and money by the Cuppels. There was further disagreement and plaintiff left again. Plaintiff claimed that these circumstances constituted an adoption agreement. The court said:

"The contents of the letter as established are in their most favorable aspect no more than a declaration by Charles Cuppel, deceased, that he intended to adopt plaintiff. This, however, is no more than a personal declaration that he had determined to adopt him, and fails to show that a contract of adoption had, in fact, been made with plaintiff's mother, the only person who could contract for plaintiff in this matter. * * *

"These facts and circumstances fail to establish that the mother and stepfather at any time consummated an agreement for his adoption, and that plaintiff, pursuant thereto, entered the family and rendered the services to the deceased."

After reciting the salient facts of the case the court said:

"These conditions also refute the contention that the court erred in not finding an express contract of adoption, as plaintiff claims. * * * It is considered that the evidence fails to establish the alleged contract of adoption.

In Re Norman's Estate, 209 Minn. 19, 295 N. W. 63, 65, the facts were that the Normans took a strange child into their care and custody to rear. The child was baptized in the name of Norman and bore that name until she was married. She was treated and raised by the Normans as their own daughter and natural child, and she treated and regarded the Normans as her parents. After the foster father died she made no claim to being his child or heir. After the widow died, she intervened in the estate, claiming all the property. Appellants claimed the evidence proved a contract of adoption but the court held:·

"The record is barren of proof that a contract to adopt was made between the Normans and the natural parents of Clarice, or that any such agreement or arrangement was made for or in her behalf at any time by anyone. Admittedly she was but a babe in arms when she came to the Norman home. How and when did such contractual relationship come into being? The record is wholly silent on this important phase. All she relies upon is the fact that she was received in the Norman home in infancy; that from that time and until she married at the age of 18 years while away from home and at school she .was treated by

them with the same kindness and consideration as if she were their natural child. But as was said in Re Estate of Hack, 166 Minn. 35, 37, 207 N. W. 17, 18 (a case where the facts are in principle similar to those here appearing): 'Whenever, in the absence of an adoption pursuant to some legislative enactment, a child received from the natural parents into the home of foster parents and treated by the latter as a natural child, has been allowed to share in the estate left by the foster parents, it was only where a contract to legally adopt such child or to give it a share in such estate is clearly proven. * * * Simply that a child of another is received into a home, cared for, and educated until the age of 16 years cannot well indicate that such a child has further claims upon those who so took it in. No doubt such a child has received much more than it has parted with.' "

The opinion distinguishes the case of In re Firle's Estate, 197 Minn. 1, 265 N. W. 818, cited in the majority opinion in this case, in the following language:

"The Firle case is probably the nearest in its facts to the instant case. There the proof was (197 Minn. 3, 265 N. W. 819) that the child was taken from the Bethany Home, 'a home for orphan children, to the home' of the Firles. 'It was the custom of the Home to require people to adopt children whom they took from the home. They "were supposed to adopt them." ' In a letter from the home to the Firles it was said: ' "**You will have to adopt him** as a deserted child as no one has any claim on him." ' (emphasis supplied.) The Firles took the child with that understanding."

The New York rule is stated in Hamlin v. Stevens, 177 N. Y. 39, 69 N. E. 118, 121. In that case the question was whether the appellant was entitled to a share of an estate by virtue of a contract between his parents and the testator. The appellant testified as to the contents · of lost letters written to his father by the testator and in which he claimed the testator promised him an equal share in the estate if the appellant would come and live with testator until he reached the age of 21. Other witnesses testified that the testator "repeatedly said he knew no difference between the appellant and his other children and that on several occa-

sions he declared he should make no difference between him and them when he came to divide his estate." The testimony regarding the relationship of appellant and the testator during the appellant's minority was affectionate and paternal.

On the question of the sufficiency of the evidence to prove a contract the court said:

"We are of the opinion that no view of the evidence in the case before us would warrant the conclusion that the alleged contract was made. Assuming that the trial judge believed that the appellant and his mother intended to tell the truth, still, owing to their deep interest, it would be unsafe to base a finding on their testimony when it may be followed by such grave consequences. Such contracts are dangerous. They threaten the security of estates, and throw doubt upon the power of a man to do what he wills with his own. The savings of a lifetime may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation, with all the dangers which, as experience shows, surround such evidence. The truth may be in them, but it is against sound policy to accept their statements as true under the circumstances and with the results pointed out. Such contracts should be in writing and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses. Unless they are established clearly by satisfactory proofs, and are equitable, specific performance should not be decreed. We wish to be emphatic upon the subject, for we are impressed with the danger, and aim to protect the community from the spoliation of dead men's estates by proof of such contracts through parol evidence given by interested witnesses."

The majority opinion in this case refers to Edson v. Parsons, a New York case. The issue there was whether the evidence was sufficient to show that two sisters had entered into an oral agreement to execute mutual wills. The court held that the circumstances were not suffcent to show such an agreement. The rule by which the court determined the sufficiency of the evidence to prove such a

contract in a will case is not the rule which prevails in cases involving alleged oral agreements to adopt or to grant a right of inheritance. This is shown by the decisions in the New York cases cited above.

The case of Niehaus v. Madden, 348 Mo. 770, 155 S. W.2d 141, 145, cited in the majority opinion, was an action by Theresa V. Niehaus against Madden, administrator of the estate of Henrietta A. S. Borck, deceased, for the specific performance of a contract of adoption. The decedent was the widow of Doctor Edward Borck. The evidence showed that Dr. Edward Borck met Meyer, guardian of plaintiff, and stated that he would like to adopt the plaintiff. He made an offer to adopt the child and to treat her as his own. Henrietta, his deceased wife, was not present. The question in this case was not whether the contract of adoption had been made by Doctor Edward Borck, but whether such a contract had been made by Henrietta Borck, his widow, deceased. The evidence relied upon by the plaintiff was that decedent stated to plaintiff's uncle that she was anxious to make the adoption and asked him to secure the consent of plaintiff's parents. That after the plaintiff came to St. Louis to live with the Borcks, Henrietta Borck said she was glad she was going to get to adopt the child; that she made other statements of her desire and intent to make the adoption; that she admitted to one witness that she authorized her husband to make the contract of adoption; that she ratified the husband's agency in making the contract of adoption; that she took plaintiff into her home after the contract was made by her husband. There was other evidence of statements of desire and intent to adopt made by Henrietta Borck, deceased. In regard to this evidence and the sufficiency of it, the court said:

"If any contract of adoption were actually made in this case, the offer to adopt is to be found in the conversation of Dr. Edward Borck with the witness Meyer had in 1908 and in his letters to the witness Meyer written shortly after that conversation. Assuming that such offer was accepted by the plaintiff when she came to St. Louis, this would at most show a contract between Edward Borck on one part and the plaintiff or her guardian on the other. Henrietta

Borck could be bound by that contract only if it be shown that Edward Borck in making the offer acted as her duly authorized agent or that he purported act as her agent without actual authority and that she later ratified such act. * * * Reasonably construed, the offer was one to have the girl adopted by Edward only. It is difficult to see how such an offer could have been later ratified by Henrietta. Appellant insists that her evidence shows that prior to this time Henrietta wanted to adopt her; but this circumstance, taken alone, is far from sufficient to prove that Henrietta authorized her husband to enter into an adoption contract. Nor is appellant's case strengthened by the fact that Henrietta told Charles Weinmann that her husband would write for her to him about the adoption. This was not an authority to the husband to write to Meyer on behalf of his wife. Nor can we conclude from the fact that Henrietta stated after the children had come to St. Loius that she was glad she was going to get to adopt Theresa, that she had authorized her husband to enter into a legal contract of adoption or that she was ratifying his purported agency in that regard. Certainly the evidence offered does not meet the requirements laid down in our cases above cited in that it is not clear, unequivocal and entirely convincing. In the absence of such evidence we could not hold that a contract to adopt had been proven."

The court held that the plaintiff had failed to prove a contract of adoption made by Henrietta A. S. Borck, deceased.

The decision in Roberts v. Roberts, 8 Cir., 223 F. 775, is certainly inconsistent with the Missouri rule as stated and applied in recent cases.

This court has never before passed upon the question of the sufficiency of circumstantial evidence to support a contract of adoption.

In Quinn v. Quinn, 5 S. D. 328, 58 N. W. 808, 49 Am. St. Rep. 875, the question was whether an oral agreement to make an adopted child an heir was within the statute of frauds.

The case of Kroeger v. Warren, 31 S. D. 480, 141 N. W. 395, involved a contract to convey real property in consid-

eration of care and support. No question of adoption or the right of inheritance was involved.

In Gravning v. Olson, 62 S. D. 139, 252 N. W. 13, there was an express contract to take the boy and keep him for their own; that they would later on adopt the child and that when they died the child would get all their property. The question was the sufficiency of the evidence to prove the oral agreement. The surrounding circumstances and the relationship of the parties were shown for the purpose of corroborating direct evidence of the oral agreement.

In Rhode v. Farup, 67 S. D. 437, 293 N. W. 632, the contract to adopt was proved by oral testimony showing an agreement that the foster parents would take the boy and keep him for their own and would leave their property to him. As in the Gravning case, the surrounding circumstances were admitted for the purpose of corroboration of the oral contract.

In Walsh v. Fitzgerald, 67 S. D. 623, 297 N. W. 675, 678, the evidence showed that while the child was a minor, it was agreed between the father of the minor and deceased that the deceased was to adopt the child and was to make said child her heir. The petition for adoption made by decedent after the child had reached majority recited that the petitioner desired to provide "for the care and comfort of the child and make the child her heir." The concurring opinion says in regard to this recital:

"Though this is not evidence in itself of a contract, it is consistent with the claim of the plaintiff and when considered with testimony as to conversations between deceased and Thomas Walsh, the father of the plaintiff, and the conduct of the parties, the evidence in my opinion is sufficient to sustain the findings of fact."

At the time the Helds took this child her mother had died. The alleged contract could have been made only by agreement between the child's father and the Helds. The record contains not one word of evidence to show that the matter of adoption or the right of heirship was ever discussed, orally or in writing, in any communication between them. Therefore, in my opnion, the evidence is insufficient to justify the finding that a contract of adoption was made.