JOHNSTON, Respondent, v. ERIKSSON, et al, Appellants

(23 N. W.2d 799.)

(File No. 8829. Opinion filed July 15, 1946.)
Rehearing Denied September 9, 1946.

**Jones, Matthews & Fitzpatrick,** of Sioux Falls, and **John T. Heffron,** of Deadwood, for Appellants.

**E. B. Adams,** of Hot Springs, for Respondent.

ROBERTS, J. This action was brought by Hilda Johnston for the specific performance of an oral contract. Plaintiff alleges that Edward Vappling was married to Hannah Juntti, sister of plaintiff's father; that the Vapplings, who were childless, obtained the consent of Gustav Juntti, the father, to take plaintiff into their home and it was agreed between the father and Edward Vappling that the latter would adopt and make the child an heir; that plaintiff in pursuance to the terms of the agreement resided with the Vapplings and rendered such obedience and affection as is usually rendered to parents by a child. The prayer of the complaint is that plaintiff be declared by the judgment of

the court to be the adopted child of Edward Vappling and to be entitled the right of inheritance in the estate of the adoptive parent.

The court found that an agreement to take and adopt the plaintiff was made; that the father of the plaintiff relinquished all parental authority and made no further contribution to her support or education; that Edward Vappling in the fall of 1923 brought plaintiff to the Vappling home and assumed custody and care of her; that plaintiff resided with the Vapplings and in compliance with the agreement rendered to them the services and affection of a natural child; and that the parties fully performed the terms of the agreement "except only the making and filing of legal adoption papers." The court declared plaintiff to. be the owner of all the property of the deceased, Edward Vappling. From this judgment an appeal has been taken to this court by those defendants who are the sole heirs at law of the deceased and entitled to his estate unless plaintiff ultimately establishes her right thereto.

■ It is the settled law in this state that a contract to adopt, not followed by effectual adoption proceedings during the lifetime of the adoptive parent, may be enforced to the extent of declaring that the adopted child is entitled to inherit from the estate of the adoptive parent. Crilly v. Morris, 70 S. D. 584, 19 N. W.2d 836.

■ The burden of proof rests upon a person seeking to share in the estate of an adoptive parent by virtue of such a contract to establish it "by evidence so clear, cogent and convincing as to leave no reasonable doubt as to the agreement." Crilly v. Morris, supra. Under this rule relief should be cautiously granted and each case must rest on its own facts.

There is no direct evidence of the making of the alleged agreement between the father and the uncle, as the father had died before this action was brought. Plaintiff relies upon à contract as evidenced by the conduct and admissions of the parties and the surrounding circumstances. The pertinent inquiry is whether there is sufficient evidence

in the record evaluated in the manner indicated to support the claim of plaintiff that a contract as alleged was made.

The record discloses that Edward Vappling was born in Sweden, emigrated to America and became a resident of Lawrence county in 1910. He married Hannah Juntti. The Vapplings resided on a farm until 1927, when they moved to Spearfish. Mrs. Vappling died in 1941. At the time of the death of Edward Vappling on January 5, 1944, his estate consisted of the farm and personal property of the approximate value of $10,000. No will was found. The appellants, residents of Sweden, are his sister, two brothers and eight children of a deceased brother.

The record further discloses that plaintiff was born January 13, 1910; that in the fall of 1923 she was living with her father on a ranch near the postoffice of Willett, in Harding county, South Dakota; that her parents had separated; that her father was in meager circumstances with a family of seven children to support; that from the time plaintiff entered the Vappling home she went by the name of Hilda Juntti; that she enrolled in the public schools and in the Black Hills Teachers College under that name and gave Willett, South Dakota, as her home and Gustav Juntti as her parent or guardian; that plaintiff called Mr. and Mrs. Vappling "Uncle" and "Aunt"; and that she was frequently referred to by Mr. Vappling as "my girl."

It is principally upon the testimony of plaintiff that the establishment of the alleged contract depends. Concerning the contract, her testimony is as follows:

"I went to live with the Vapplings in 1923. I remember the occasion when Edward Vappling came to my father's farm to get me to go and live with him. He asked me if I would want to go to Spearfish and be his girl. I told him no. He stayed all night at the farm. I went to school the next morning and when I came home at noon my father told me I had to go to Spearfish. I did not overhear any conversation between Edward Vappling and my father.

"Q. Did you have any later conversation with Ed Vappling relative to your status in the home—his home? A. Yes.

"Q. When was that, do you know? A. No, it has been many, many times.

"Q. Mrs. Johnston, about when was the first time you had a conversation with Ed Vappling relative to your status? About when was that after you left your father's home? A. It was very shortly after I came to make my home with my aunt and uncle.

"Q. You don't remember how long afterward, do you? A. No.

"Q. Who was there when you had that talk? A. My aunt and uncle.

"Q. What, if anything, did Ed Vappling tell you at that time? A. He told me I was his girl, and I was working there just like their child, and I was to have what was theirs when they were gone. My aunt died in November, 1941. I made the arrangements for the funeral. After the funeral I was at the Vappling home for a few days.

"Q. And did you have any conversation or talk with Ed Vappling at that time relative to your status? A. Yes.

"Q. What was the occasion of the conversation? What were you doing at the time? A. Well, I had just prepared supper for my uncle and husband. He was talking to me, telling me that all he had was to be mine, just like any parent would leave what they had to their child. Mr. Vappling died in January, 1944. I was at the hospital at Deadwood to see him. I was there the afternoon before he died.

"There was a conversation at that time? A. Yes.

"Q. Who was that conversation between? A. My uncle was talking to me.

"Q. And Clarence was there? A. Yes, Clarence was there in the room.

"Q. What did he say to you at that time? A. Well, he was very glad to see us, and he told us to take charge of everything. Then he turned to my husband and told him to take charge of the farm, stock and everything.

"Q. Was anything said at that time relative to the inheritance or property he might leave? A. He said it was mine, that was why he wanted my husband to take care of it. My marriage was talked over with the Vapplings. There was a conversation between Ed Vappling and Clarence at that time in my presence.

"Q. What was said by Mr. Vappling? A. He said I was his child, and that I would get what he had when he was through with it.

"Q. Now, just to go back over matters I may have overlooked, Hilda, I think you stated that there was a conversation at the time you first were to go to live with your aunt and uncle, between your father and Ed Vappling relative to the position you would occupy after you started living with them? A. Yes.

"Q. I wish you would tell the Judge now what that conversation was that you overheard between your father and Ed Vappling at that time. A. Well, my uncle told me that he was to furnish my living, my home, and that when they were through with their property, and so on, I would get it just the same as if I were their child."

On cross-examination plaintiff testified:

"I described myself in the petition for letters of administration as the adopted daughter of Edward Vappling, deceased.

"Q. And you have testified today that you heard no conversation or no talk by Edward Vappling that he was ever going to adopt you, didn't you? A. To adopt me legally—he didn't believe in that.

"Q. He didn't believe in legal adoption? A. I don't think he ever thought of legal adoption. I was his child. They called me their child . That's why I put down 'adopted daughter.' He wasn't a blood relation."

The Vapplings moved to Spearfish in the spring of 1927. Plaintiff did not thereafter reside with them while attending high school and the normal school in Spearfish, but worked elsewhere for board and room.

A number of witnesses testified as to alleged statements made by the deceased to the effect that Hilda would have or that he intended that she should have all his property when he died. Helen Rose, a witness for the plaintiff, testified:

"I recall the time when Ed came to visit my father soon after his wife died. I overheard a conversation between them.

"Q. What was said at that time? A. Well, Dad and Ed was discussing about the will. Ed asked my father what he was going to do with his things, and Dad said he was going to leave it to the children. He said to Ed, 'You better fix a will and fix your things up too, now that your wife has passed on.' Ed says 'I am, but I have no children of my own— no children to leave it to like you have,' and Dad says 'you have a sister in the Old Country,' and he says 'Yes, I have a sister in the Old Country, but I am not going to leave her anything. She has never done anything for me, and I am not going to do anything for her.' Daddy says 'You have Hilda,' and Ed says 'Yes Hilda has been a good girl; I am going to fix it up for Hilda.' "

 We have set forth substantially all of the evidence which we deem favorable to the plaintiff. If plaintiff is entitled to have the rights of a child enforced against the estate of the deceased, the evidence must disclose that Edward Vappling not only obligated himself to rear the plaintiff but to adopt her and thus to confer upon her the right of inheritance. It may be well in this connection to recall the established rule in this jurisdiction that while plaintiff may prove the existence of an oral contract to adopt by circircumstial evidence, the circumstances must sustain a strong and certain inference that a contract was made. The circumstances must be consistent with the fact to be proved and inconsistent with any other rational theory and whether it be direct or circumstantial the evidence as we have stated must be so clear, cogent and convincing as to leave no reasonable doubt as to the existence of a contract. Crilly v. Morris, supra. It is not, of course, the function of this court to determine the weight of the testimony nor to determine

whether it would have made the same or similar fact determination. Houck v. Hult, 63 S. D. 290, 258 N. W. 142. Whether the evidence is clear, cogent and convincing was a question in the first instance to be determined by the trial court and its conclusion will not be disturbed by this court unless it can be said from the record that the clear preponderance of the evidence is against the findings of the trial court. Medin v. Brookfield, 66 S. D. 209, 281 N. W. 97; Seubert v. Seubert, 68 S. D. 195, 299 N. W. 873.

■ Plaintiff admitted that she heard no conversation between her father and Edward Vappling concerning an agreement to adopt, but testified that shortly after her arrival at the Vappling home plaintiff was told by deceased that she was "his girl" and that she was "working there just like their child" and "was to have what was theirs when they were gone." Her testimony is replete with declarations by the deceased indicating that he would leave his property to the plaintiff. A number of witnesses testified as to casual statements and declarations made by the Vapplings. It does not appear from their testimony that Edward Vappling ever considered that he had in fact adopted the plaintiff as his own child or ever agreed to adopt her. The evidence merely indicates an intention on the part of Edward Vappling to leave his property to the plaintiff, but such declarations and the fact that plaintiff was received into the Vappling home, supported and educated does not prove the existence of a contract to adopt.

If it be assumed that the facts and circumstances brought out in the evidence sustain the conclusion that there was an agreement between the father and Edward Vappling and that such facts and circumstances are consistent with the existence of an agreement to adopt, we do not think that the evidence shows a condition inconsistent with any other rational theory. It can not be claimed that the evidence is not equally consistent with the theory that Edward Vappling obligated himself merely to support and educate the plaintiff in consideration of rendition of services. Admittedly, plaintiff was thirteen years of age at the time she came into the

Vappling home. From that time and until the Vapplings left the farm and moved to Spearfish she resided in their home and attended school. Thereafter, while attending high school and normal school in Spearfish she resided elsewhere and worked for room and board. Considering the family surroundings, we think that it may be reasonably inferred that the father was content with an arrangement that plaintiff reside with her aunt and uncle and have educational facilities not available at home and that the father did not insist that Edward Vappling adopt her and thus confer the right of inheritance upon her. We hold that the evidence fails to meet the requirement that to establish an oral contract to adopt the evidence must be so clear, cogent and convincing as to leave no reasonable doubt as to its existence.

The judgment appealed from is reversed.

All the Judges concur.

MUNDT, Circuit Judge, sitting for POLLEY, J.