JORGENSEN et al., Respondents, v. JORGENSEN et al., Appellants

(51 N. W.2d 632)

(File No. 9239.  Opinion filed February 4, 1952)

Rehearing denied March 17, 1952

Danforth & Danforth, Sioux Falls, for Defendants and Appellants.

W. W. French, Yankton, Phillips Crew, Vermillion, A. J. Beck, Elk Point, for Plaintiffs and Respondents.

RUDOLPH, J. This is an action to quiet title. The land in dispute originally belonged to the plaintiff, Andrew Jorgensen, who is the father of some of the parties and the grandfather of the other parties. Plaintiffs other than Andrew claim title to the land under deeds executed in 1949. Defendants claim title under a deed executed in 1939 and another deed in 1946. The trial court held plaintiffs' title good under the 1949 deeds, and defendants appeal.

The controversy had its inception on December 29, 1939, when Andrew Jorgensen, who was then 78 years of age, telephoned Norman Jaquith, a lawyer at Vermillion, and requested Mr. Jaquith to come to the Jorgensen farm home. Mr. Jaquith complied with this request and it developed that the purpose of the meeting was the execution of deeds by Mr. Jorgensen, the grantees being members of his family. He had heard of a neighbor executing deeds to his children whereby they became possessed of the land after his death. Two old friends of Mr. Jorgensen were present and a discussion was had concerning the property. After determining the deeds that would be necessary, Mr. Jaquith returned to his office, prepared the deeds and then returned to the farm home where the deeds were executed. Upon their execution

the deeds were delivered to Mr. Jaquith with instructions to hold until the death of Mr. Jorgensen. The deeds were placed in an envelope and endorsed upon the envelope was the following:

"Vermillion, South Dakota,

"December 29, 1939

'To Norman Jaquith

"The within deeds this day are delivered to Norman Jaquith to be held in escrow and delivered to the grantees at the time of my death."

The above direction was signed by Mr. Jorgensen and witnessed by the two neighbors. The deeding of the property as made by Mr. Jorgensen was largely in favor of Martin C. Jorgensen. This fact was commented upon Mr. Jaquith at the time whereupon Mr. Jorgensen said in substance that it was his property and that he was going to do with it as he wished.

Andrew Jorgensen was an old timer in the Vermillion country. He was twice married. His first wife died about 1894 at which time there were four children—Fedder, Cena, Peder and Harry. Andrew was married a second time and two children were born of this second marriage but only Martin C. survived to become involved in this present trouble. When the first wife died the children were small and all were raised as a family by Martin's mother. The children remained at home until they were old enough to go out and start farming on their own, some of them farming land owned by the father. Martin left but in 1924 returned to the old home place and has farmed that place since at least 1936. In 1922 Andrew built a new house a short distance from the old home where he and his wife lived but the farm land was operated by tenants. The new house was only a few rods from the old house where Martin and his family had lived since 1924. Martin's mother died in 1929 and thereafter Andrew lived alone in the new house until 1947. At the time of the trial Fedder and Peder were blind and had been for a period of more than 25 years preceding. Harry was nearly blind but could see to some extent. Fedder and Peder never married and lived at times with other members of the family. The daughter Cena had died and

the plaintiffs Mattie Nordhagen, Elmer Kryger and Mayme Trankel are her surviving children.

Andrew Jorgensen had accumulated approximately 452 acres of land. In the 1939 transaction approximately 332 acres of this land were deeded to Martin and his family, 80 acres to Harry and his family and 40 acres jointly to Cena, Fedder and Peder. These 1939 deeds remained with Mr. Jaquith undisturbed until 1946. In June, 1946, Andrew Jorgensen became ill and was in a hospital for a short time. The evidence describes his illness as a "stroke". Upon Andrew's release from the hospital and his return to his home there was some discussion between Martin and Harry regarding Andrew's future and method of living. Following this discussion Andrew gave to Harry a power of attorney which granted full control of the father's business. On July 25, 1946, Harry and his father appeared at Mr. Jaquith's office. Just what happened there is in dispute. Harry testified that there was no deed executed only a bill of sale. Mr. Jaquith testified that Andrew stated that he had sold 17 acres of the land he had deeded to Martin in 1939 and that since 1939 another child had been born to Martin and that he wished to change Martin's deed by including the last born child and to substitute 19 acres of land in the place of the 17 acres which he had sold in 1944. Mr. Jaquith testified that a deed was made corresponding to these desires of Andrew and that when Andrew left he took such deed with him. It also appears that at this time Andrew executed a bill of sale to the so-called new house transferring title thereto to Harry. A short time thereafter this house was moved to the premises occupied by Harry, and the father resided therein. Subsequent to July 1946 it was sought to get possession of the 1939 deeds from Mr. Jaquith. However, Mr. Jaquith stated that he could not turn over such deeds without an order of court authorizing him so to do. Thereafter there was some consultation between Mr. Jaquith and Mr. Everett Bogue, a lawyer at Vermillion, following which Mr. Bogue commenced an action in circuit court entitled Andrew Jorgensen v. Norman Jaquith. By this action plaintiff sought to recover from Mr. Jaquith the 1939 deeds. Martin Jorgensen and the children of Cena intervened in the action.

It was the position of the defendant and intervenors that the execution of the 1939 deeds passed title to the intervenors with enjoyment thereof and possession deferred until the death of Andrew. Following the trial the court found adversely to the defendant and intervenors and directed Mr. Jaquith to return the deeds to Andrew. The deeds were returned by Mr. Jaquith and were destroyed. However, copies were made and retained in the circuit court file. Subsequently attempts were made to get all of those interested in Andrew's property to agree upon a division thereof to be effective after Andrew's death. Nothing was accomplished. However, Andrew did convey some of his property to Harry including a 19-acre tract for which Harry paid $1,000. On May 19, 1949, Andrew Jorgensen consulted Mr. Everett Bogue and at that time deeds were executed to all of the property belonging to Mr. Jorgensen, which had not been transferred to Harry.

To Martin there was conveyed approximately 90 acres upon which were located the buildings where Martin and his family resided. Fedder, Peder and Harry were deeded approximately 160 acres and the children of Cena 80 acres. These 1949 deeds were to be delivered upon the execution by the grantees therein named of an agreement to pay Andrew $2.50 an acre annually as long as he lived. All of the grantees named in the several deeds except Martin signed this agreement and have made payments accordingly. However, Martin has refused to accept the deed to this land or to execute the agreement.

The 1946 deed testified to by Mr. Jaquith as being executed in his office and having been taken therefrom by Andrew was placed on record by Martin following the recording of the 1949 deeds. Martin and his wife testified that this deed was given to them on a certain Sunday in August 1946 by Andrew who told them it was a gift. They further testified that thereafter the deed was misplaced in a sewing basket and was not found until shortly before it was recorded. The trial court made a finding rejecting this testimony concerning the delivery of the 1946 deed. Throughout all of the negotiations and dealings with the Jorgensen property, subsequent to July 1946, no mention of this deed was

made by Martin or his wife to anyone. The only time the existence of this deed is mentioned or referred to is in the notice served by Mr. Bogue prior to the action of Andrew Jorgensen v. Jaquith wherein he demanded not only that the 1939 deeds be returned by Mr. Jaquith but also demanded the return of the 1946 deed and the bill of sale. However, in the action no mention was made of these 1946 instruments, nor any disposition made thereof.

The above statement of facts is sufficient for our present purpose. Other facts will be mentioned in the discussion of the issues presented by the record.

The trial court found that "Andrew Jorgensen did not intend a present, irrevocable delivery of the deeds dated December 29, 1939, * * *. Both Andrew Jorgensen and Norman Jaquith considered the control of the aforesaid deeds still to be in Andrew Jorgensen. Andrew Jorgensen intended no more than that the aforesaid three deeds were a disposition of his land therein described provided he did not, before his death, otherwise deal with the same". Appellant questions this finding and states that it is the primary question for consideration in this case.

The rule in this state applicable to the delivery of a deed to a depositary with instructions to deliver to the named grantee upon the death of the grantor is stated in Stalting v. Statling, 52 S. D. 309, 217 N.W. 386, 389, as follows: "* * * if the grantor unconditionally hands over the deed to the depositary, placing it beyond the control and dominion of the grantor, with instructions to transmit to the grantee at grantor's death, there is then a valid, effective, and irrevocable delivery of the instrument as a deed, and a present interest in the realty passes at that time to the grantee, although the enjoyment thereof is deferred until the death of the grantor. If, however, when the instrument is handed over to the depositary, the grantor retains control and dominion over it, and the instruction is to deliver the deed to the grantee at grantor's death, unless otherwise directed in the meantime, there is no delivery of a deed, but merely an effort to make a will in a manner not recognized by the law; the depositary remains the agent of the grantor only, and his authority to deliver is terminated

by the death of the grantor, and the instrument can have no effect, unless it was executed with the formalities required for the execution of a will."

In each instance a fact question is presented. What was the intention of the grantor at the time of the placing the deed with the depositary, did he intend that such act should be irrevocable, or did he intend to retain control over the deeds, and the right to change or recall them as he wished? The intention at the time of placing the deeds with the depositary being the controlling issue, the question of whether subsequent acts of the grantor are admissible as evidence of his intention at the prior time becomes important. As disclosed by the findings in this case the trial court considered the acts of the grantor subsequent to the time he placed the deeds with Mr. Jaquith as evidence of his intention at such time. In the Stalting case this court said that the grantor's intention should "be determined from his acts and statements and all surrounding circumstances at the time of the deposit of the deeds." However, the facts in that case disclosed no subsequent acts of the grantor that might have been indicative of his intention at the time he placed the deeds with the depositary, and there was no necessity and apparently no intention to determine the admissibility in evidence of subsequent acts. Of course if it clearly appears that the grantor intended to part with all control over the deed subsequent acts are not competent evidence, but on reason and authority it would seem that if the intention of the grantor at the time of handing the deeds to the depositary is not clearly established by his words and acts at the time, his subsequent acts should be competent to aid in determining his intention in placing the deed with the depositary.

Appellant contends that the written instructions in this case are conclusive, in that there is no reservation therein by the grantor of any right to control the disposition of the deeds. Neither is there any expression in the writing that the grantor did not reserve such right. Grantor, no doubt, intended that it was his purpose to retain possession and enjoyment of the land during his lifetime. But there is nothing in the writing concerning his future control of

the deeds, and this intention must be determined apart from the writing.

The California court has been confronted with numerous cases involving questions identical with those here presented. The rule as established in that state is summarized in the case of Manwell v. Board of Home Missions, 122 Cal. App. 599, 10 P.2d 787, 790. We quote at length from that opinion.

"The rule is well settled that if a deed, fully executed and so drawn as to convey a present title, is deposited by the grantor with a third person, with directions to deliver it to the grantee after the death of the grantor, and the grantor in making such deposit reserves no power to recall or modify the same, or thereafter to control in any way the disposition of the deed, the deed is not an attempted testamentary disposition, but is effective as a conveyance of title, qualified only by a life tenancy in the grantor, and the depositary becomes the trustee of the grantee. Bury v. Young, 98 Cal. 446, 33 P. 338, 35 Am.St.Rep. 186. Williams v. Kidd, 170 Cal. 631, 151 P. 1, Ann.Cas.1916E, 703. But if the grantor intends to retain control of the deed, or of his rights of property, including the right of disposition and control until his death, with the intention that the depositary shall deliver the deed to the grantee upon the death of the grantor, only in the event the grantor shall not have recalled it, or made other disposition of the property, delivery is lacking (Northern California Conference Ass'n, etc., v. Smith, 209 Cal. 26, 285 P. 314, 317); and whether a deed, which has been placed in the hands of a third person, has passed beyond the control of the grantor is to be determined by the latter's intention (Bury v. Young, supra; Williams v. Kidd, supra). This has been held to be a question of fact (Bury v. Young, supra; Williams v. Kidd, supra; In re Estate of Cornelius, 151 Cal. 550, 91 P. 329; Hotaling v. Hotaling, 193 Cal. 368, 224 P. 455, 56 A.L.R. 734; Kimbro v. Kimbro, 199 Cal. 344, 249 P. 180), unless the instructions are entirely in writing. When such is the case, it has been held that the question is one of law, Moore v. Trott, 156 Cal. 353, 104 P. 578, 134 Am.St.Rep. 131. But, where the written instruments do not purport to be all the directions given, or the

same are equivocal, evidence of the circumstances attending the preparation of the deed and the acts and statements of the alleged grantor material to the question of delivery during the entire period of escrow is admissible. Williams v. Kidd, supra; Donahue v. Sweeney, 171 Cal. 388, 153 P. 708; Tweedale v. Barnett, 172 Cal. 271, 156 P. 483; Smith v. Smith, 173 Cal. 725, 161 P. 495; Fisher v. Oliver, 174 Cal. 781, 164 P. 800; Rees v. Rees, 191 Cal. 399, 216 P. 1006.

"In the present case the only direction in the letter as to the disposition to be made of the deeds was the following: 'You are hereby instructed to file said deeds for record with the county recorder of Los Angeles county promptly upon my death.' In Northern California Conference Ass'n, etc., v. Smith, supra, the written direction was 'Give the within deed to the grantees on my death;' and it was held in effect that this was not conclusive upon the question of intention. So in Rice v. Carey, 170 Cal. 748, 151 P. 135, 137—where it was held that there was no delivery—a depositary was directed to 'take these deeds, put them away with your papers, and at my death have them recorded.' In each of the above cases the subsequent conduct of the grantor showed sufficiently that the transaction was an attempted testamentary disposition of the property described in the deeds, and the conclusions of the court to that effect were sustained.

"It is clear that the language of the letter was not necessarily inconsistent with the intention that the deed should not be immediately effective. In determining the question, the fact that the grantor subsequently deals with the property in a manner inconsistent with the theory of an effective delivery is a relevant circumstance (Williams v. Kidd, supra); and the understanding of the depositary, as to the effect of the previous transaction, is important only as bearing upon the value of his testimony at the time of the alleged delivery (Wilcox v. Hardisty, 60, Cal.App. 206, 212 P. 633). Whatever the understanding of the witness Sturdevant as to Mrs. Manwell's intention in the transaction, her subsequent statement referring thereto in connection with her proposed will that 'it's the last one that counts,' and the fact that she did execute a will disposing of the same property in a different way, support the conclusion that she un-

derstood the first transaction to be in effect a testamentary disposition of the property, and that no effective delivery of the deeds was intended. The other testimony adduced by plaintiffs also tends, though in a lesser degree, to the same conclusion."

See also O'Brien v. O'Brien, 19 N. D. 713, 125 N.W. 307; Annotation 105 A.L.R. 410. From the evidence it appears that Mr. Jaquith at no time advised Mr. Jorgensen that the delivery of the deed to him to be good must be an irrevocable act, and we know that the idea that a deed may serve as a substitute for a will without diminishing the grantor's estate in his lifetime is widely accepted. Not only does it appear that it was never explained to Mr. Jorgensen that to make the deeds effective the act of placing the deeds with Mr. Jaquith should be irrevocable, but it further appears that neither Mr. Jorgensen nor Mr. Jaquith considered it as such. Mr. Jorgensen sold part of the land described in the deeds and at his request Mr. Jaquith purported to change one of the deeds. The bill of sale not only purported to sell the house which was a part of the realty described in the deeds, but it attached conditions to the delivery of the deed to Martin which were not attached when the deeds were left with Mr. Jaquith in the first instance. It further appears that Mr. Jorgensen subsequently made wills wherein he purported to devise some of the property described in the deeds.

We hold, therefore, that the trial court's finding above set out finds support in the record, and is not subject to change by this court. This holding makes unnecessary any consideration of respondents' contention that the 1946 action concerning these deeds is res judicata as to those who intervened therein.

Appellant further contends that in any event the 1946 deed wherein Martin and his family were named as grantee was executed and delivered in a manner so as to convey the land described therein to the named grantees. On this issue the trial court found as follows: "The Court seriously doubts and does not believe that the deed of July 25, 1946, Exhibit C, was handed by Andrew Jorgensen to Amy Jorgensen; that such deed was then mislaid and then, after the lapse of nearly three years, was suddenly found. The Court,

therefore and under all the evidence, finds there was no valid delivery of the deed of July 25, 1946, * * *."

The father, Andrew, although still living at the time of the trial and a party to this action, represented by a guardian ad litem, did not testify as a witness. A consideration of the entire record, including the proceedings had for the appointment of a guardian in November, 1949, convinces us, as it must have convinced the trial court, that by the time of the trial Andrew had deteriorated, physically and mentally, to the extent that his testimony would have no value. This fact left the truth of the story of delivery of the 1946 deed dependent entirely upon the testimony of Martin and his wife, the beneficiaries of this alleged transaction. We think such is the fact, because the only other testimony relating to the alleged delivery of this deed was the testimony of a Mrs. Millage. Mrs. Millage testified that she was present in the Martin Jorgensen home at the time Martin and his wife claim Andrew gave them the deed, but Mrs. Millage remembered none of the conversation between the parties, and at the most remembered only seeing Andrew hand Martin some paper, what the paper was, its size or appearance she could not say.

Martin's story regarding this transaction was testified to as follows:

"A. He come over there, had an envelope in his hand and a paper in it and he brought it over to me and just opened it up and took it out and showed it to me what it was and did not read it or anything, and he handed it and said, 'Here is a gift for me and the wife and the children.'

"Q. And then what was done with it? Go on and tell. A. Then the Misses she took it and stuck it in a basket. So that evening we thought we would glance over it and see what is was. He had given us instructions that we were supposed to take it and keep it and take care of it because it was a deed to some property.

"Q. Did he go over and talk to your wife afterwards in your presence after he had given it to you first? A. Yes, took it over and gave it to her.

"Q. Now give us all the converastion that you can as near as you can recall what he said about the farm, your

farming it or anything of that kind. Give the story as best you can. A. After he. gave us that he said that he wanted us to stay on the place and farm it and give share rent like we had always done and he would look after the other part and he would pay the taxes and we should not put it on record until something happened to him.

"Q. Then after that did you know where your wife put the deed? A. No. I did not."

Mrs. Jorgensen testified that she put the deed with some fancy work, then forgot all about it until 1947, when it was found but nothing was said about it to anyone until after the recording of the 1949 deeds. She also testified as did Martin that Andrew said he wanted them to stay on the farm and pay share rent, and record the deed after something happened to him. But both had testified that they did not know what it was that Andrew gave them, until that evening after Andrew left when Martin looked at the deed. We cannot go into the entire testimony regarding this transaction but to say the least it is inconsistent and contradictory in instances, even to the extent of Mrs. Jorgensen testifying at one time that the deed was given to them before Mrs. Millage arrived.

■■ The story of putting the deed in a sewing basket, forgetting it, later finding it but saying nothing about it during all of these proceedings when its existence as a valid conveyance of the property would have settled many of the controversies between the parties, certainly is a story of a nature to tax the credulity of the court. We believe this transaction as testified to by Martin and his wife brings it squarely within the rule established in this state that where even unimpeached witnesses testify distinctly and positively to a fact and are uncontradicted, but the statements of the witnesses are grossly improbable or they have an interest in the question at issue, courts are not bound to accept the statements of such witnesses. Crilly v. Morris, 70 S. D. 584, 19 N.W.2d 836, and cases cited.

■ Appellants came into court and told their story concerning the delivery of the deed. They did not rely upon any presumption of delivery arising because of the deed being in their possession. But conceding that such presump-

tion exists, even though the grantee testifies specifically concerning the manner in which the deed came into his possession, nevertheless we believe that such presumption has been overcome in this case. The trial court determined that the story given by appellants concerning the delivery was a fabrication. Having come to this conclusion, we believe that the court was justified in concluding appellants' possession was gained in some manner not constituting a delivery. Otherwise why the fabrication? There is the further evidence given by Harry, that he was positive that his father did not take the 1946 deed from Mr. Jaquith's office, and since Martin's story of delivery must of necessity depend upon Andrew taking the deed from the Jaquith office as testified to by Mr. Jaquith, the whole foundation of that story falls with the election to believe Harry's version. This is not a case where the credibility as between witnesses was left undetermined, as in the case of Schurz v. Schurz, 153 Iowa 187, 128 N.W. 944, but the trial court in this case refused to believe the story told by Martin and Amy. It follows, therefore, that the finding of no delivery of this 1946 deed by the trial court must be sustained.

The trial court found that: "Andrew Jorgensen was mentally competent in May, 1949, to understandingly execute and deliver the deeds of May 19, 1949, * * *." The extent of the impairment of the faculties by disease or old age required to invalidate a deed has been stated by this court in Egan v. Shindelbower, 73 S.D. 212, 41 N.W.2d 225. We have reviewed the evidence in this case in the light of the announced rule. Nothing would be gained in setting forth the evidence. The testimony of Mr. Bogue, who prepared the deeds, Dr. Brookman, who examined Andrew Jorgensen on the day the deeds were executed and Mr. Dwyer is sufficient to sustain the finding of the trial court.

Appellants complain because the trial court refused to hold that the 1949 deeds were the result of undue influence exercised by Harry over his father. There is no direct evidence of undue influence, but appellants contend that following the execution of the power of attorney a confidential relationship existed between Harry and his father and that in the view of this relationship the trial court should have

declared the 1949 deeds invalid. In the case of Samelson v. Samelson, 71 S. D. 293, 23 N.W.2d 806, 808, this court held: "The general rule appears to be that the mere existence of a confidential relationship does not, as a matter of law, operate to bar the right of a beneficiary to receive a gift. If the donor was at the time of sound mind and clearly understood the transaction and exercised a free will in the act, being under no restraint or undue influence, such gift will be supported. * * * The fact that such a confidential and fiduciary relationship was present in this case was a matter to be considered by the trier of fact along with other evidence, but it is not conclusive against the donee, though all such transactions are carefully scrutinized by a court of equity."

The trial court found that Mr. Bogue was the attorney for Andrew Jorgensen in this 1949 transaction. Mr. Bogue, after having withdrawn as an attorney in the case, was a witness. Mr. Bogue also prepared two wills for Andrew. In spite of appellants' vigorous assertions to the contrary we believe the record fairly establishes that Andrew had the independent legal advice of Mr. Bogue. While it is true that the 1949 division of Andrew's property gave Harry more and Martin less than the attempted 1939 division, we do not believe that this fact, and the relationship between Harry and his father compels a finding of undue influence, especially when considered in the light of the Bogue testimony and other facts in the record. It appears that Andrew and all others interested were advised of this 1949 division before it was finally consummated while in attendance at the conferences in Mr. Dwyer's office in April, 1949. Mr. Dwyer testified that Andrew was competent and that Andrew said he wanted his property divided substantially as reflected by the 1949 deeds. We are of the opinion, therefore, that the absence of and direct evidence of undue influence by Harry, and the fact that Andrew had the advice of Mr. Bogue and was competent to make a disposition of his property sustain the trial court's refusal to hold that the deeds were the result of undue influence by Harry.

The judgment appealed from is affirmed.

ROBERTS, SMITH and LEEDOM, JJ., concur.

SICKEL, P. J., dissents.

SICKEL, P. J. (dissenting). It seems to me that the decision in this case overrules O'Connor v. McCabe, 46 S. D. 269, 192 N.W. 370, and Merkamp v. Niles, 62 S. D. 241, 252 N.W. 636. The rule announced in those cases is supported by the annotation in 52 A.L.R. 1247. These decisions have become rules of property in this state and should not be disturbed except by legislation with proper reservations for the protection of vested rights. In my opinion the decision also violates the parol evidence rule. SDC 10.0604 and 10.0806.