BENTZ et ux., Appellants v. ESTERLING et al., Respondents

(78 N.W.2d 73)

(File No. 9557. Opinion filed August 21, 1956)

**Dudley R. Herman,** Gregory, for Plaintiffs and Appellants.

**G. F. Johnson,** Gregory, **Parnell J. Donohue,** Bonesteel, **Harold Gunvordahl,** Burke, for Defendants and Respondents.

SMITH, J.   The narrow issue presented for our decision by this appeal is whether the evidence supports the finding of the trial court that the plaintiffs above-named made a parol gift in praesenti of a half section Tripp county farm to their son, the late John Bentz.   Our review of this record proceeds in the light of settled principles which counsel do not question.

The annotation at 101 A.L.R. 985 states, "The general rule is well settled that, so far as the Statutes of Frauds is concerned, an oral gift or promise to convey real property will be specifically enforced where there has been a part performance thereof by the donee, or acts have been done by him in reliance on the promise, which place him in situation that will result in fraud or prejudice to him unless the promise is performed." Cook v. Cook, 24 S.D. 223, 123 N.W. 693; Christensen v. Christensen, 62 S.D. 541, 255 N. W. 109; Comment note 155 A.L.R. 76, and see 13 Ill.L.Rev. 667 at 672; 33 Harvard L.Rev. 929 at 949; and 73 Penn.L.Rev. 51.

In Cook v. Cook, supra [24 S.D. 223, 123 N.W. 694] it is written, "While gifts of real estate from parent to child, if made by parol, will be sustained regardless of the statute of frauds, provided that on strength of such gift the child has taken possession of the premises and made permanent and valuable improvements thereon, yet, in view of the fact that this allowing parol evidence of conveyance of real estate is liable to open the doors to a great amount of fraud,

it has become a well-established rule of evidence that parol gifts of land from parent to child will not be sustained except upon the clearest and most convincing evidence." The annotator, 155 A.L.R. 80, writes, "The evidence to establish a parol gift of land must be of a highly convincing order. It must be clear, unequivocal, convincing, and definite. However, the proof of such a gift need not be absolutely conclusive or undisputed." In treating of the "clear and convincing" rule in a case of a different character this court in Muller v. Flavin, 13 S.D. 595, at page 605, 83 N.W. 687, at page 690, said, "Undoubtedly, as stated by counsel for the appellant, the evidence tending to show that a deed is intended as a mortgage must be clear and satisfactory; but it is not necessary that the evidence should be absolutely conclusive, or that the transaction should be proven by direct evidence." Cf. Crilly v. Morris, 70 S.D. 584, at page 599, 19 N.W.2d 836, at page 843.

The clear and convincing rule is addressed to the trier of the fact. In Medin v. Brookfield, 66 S.D. 209, 281 N.W. 97, at page 99, we said, "Whether the evidence in a given case is clear and convincing is a question in the first instance to be determined by the trial court, and its conclusion is not to be disturbed by this court unless it can be said after an examination of the entire record and all circumstances surrounding the transaction as therein disclosed that the clear preponderance of the evidence is against the findings of the trial court, * * *." In other words, this court, which does not try such a cause de novo, is not warranted in disturbing a finding of the trier of the fact, unless after reviewing the entire record in the light of the clear and convincing rule, a clear preponderance of the evidence convinces us it was unreasonable for the trial court so to find. Seubert v. Seubert, 68 S.D. 195, 299 N.W. 873. Needless to say, the credibility of witnesses is for the trier of the fact. Houck v. Hult, 63 S.D. 290, 258 N.W. 142; and Rhode v. Farup, 67 S.D. 437, 293 N.W. 632.

The plaintiffs Peter and Rebecca Bentz married in this country but came here during their youth from foreign lands. Neither of them had the privilege of much schooling and Mr. Bentz can neither read nor write. To their union

was born two sons, John and George. Throughout the years these boys worked hard assisting their father in his farming operations. In 1936 John married the defendant now known as Margaret Esterling. To this marriage three children were born, the defendants, Patricia Darlene, Margaret and Robert. The boy Robert is sometimes called Jimmy. John Bentz died from an illness of long standing in 1951. Thereafter George Bentz qualified as the executor of his last will and testament. Margaret Bentz married Ruben Esterling in February 1953.

Mention must be made of three tracts of land. Peter Bentz acquired a 160-acre farm near Millboro, South Dakota, referred to as his homestead. Later he acquired a 320-acre tract near Dallas which will be referred to as the home farm. A distance of forty or fifty miles separated these farms. In 1940 the Lincoln National Life Insurance Company conveyed a 320-acre farm located a little less than three miles from the above mentioned home farm to Peter, Rebecca, John and Margaret. For convenience we refer to this as John's farm. It is this last mentioned farm which is the subject matter of this litigation.

Two versions of events are recorded in the testimony. One of them comes from Margaret, the widow of John, and the other from Peter Bentz. We first depict these events as they are described by Margaret in connection with some facts not in dispute.

John Bentz had lived alone at times on the above described Millboro homestead quarter. In 1936 when he married Margaret they established their home on that farm. So long as they lived there Margaret believed John owned that place. His father had in fact deeded it to him in 1936, but John deeded it back before he married Margaret. While they lived there the old folks visited them about three times a year and they made visits to the home farm. After the birth of the first granddaughter, Margaret states that while Peter and Rebecca were visiting at the homestead, they asked if John and Margaret would be willing to move over closer to the home place so they could be nearer to the granddaughter, and also to permit an exchange of work. This matter was discussed more than once. John said they

had no place on which to move. The father and mother, according to Margaret, then proposed that if the young folks would be willing to move they would buy them a farm. It was suggested, she says, that the homestead could be traded in on the deal. Peter told them to start looking for a place to buy. Thereafter John and Margaret would drive to the home place, and the four of them, Peter, Rebecca, Margaret and John, went together on more than one occasion looking at farms. Margaret said they "told us to look for a place we wanted and that is what they would get us." She also said "They let us have our choice, what we wanted, we were looking at the buildings and if we liked them it was up to us." Finally they settled on the farm we have referred to as John's farm. Their negotiations were with a Mr. Bigelow of Winner, an agent of the Lincoln National Life Insurance Company. In the negotiations, Margaret testified, Mr. Bigelow explained because of their finances the company would not enter into a contract for deed with John and Margaret. Thereupon, according to Margaret, "Mr. and Mrs. Bentz said they would buy us a place and back us." Again she testified that Mrs. Bentz said they were buying a farm for their son. The proposal to purchase on a company form was signed by Peter and John. The contract for deed, prepared by the company ran to "Peter Bentz and Rebecca Bentz, husband and wife, and John Bentz and Margaret Bentz, husband and wife". The purchase price was $4,200 payable $840 in cash, $105 on March 1st for nine years, and the balance of $2,415 on March 1st of the 10th year. The $840 cash payment was derived from a sale of the homestead quarter. John paid the annual installments to and including 1943. In 1944 Peter decided to pay up the contract. He and John retained a Gregory lawyer to handle the matter and left Peter's check with him for $2,940 on Feb. 25, 1944. The deed eventually issued was dated at the home office of the company March 9, 1944, and was recorded July 3, 1944. It named the grantees exactly as the purchasers appear in the contract for deed. The deed and abstract remained in the lawyer's office for a long period of time. Eventually he wrote and asked them to call for them. Margaret got them

and placed them in what she called a safe box in the cupboard where they were found after John's death.

Shortly after the contract for deed was executed in January 1940, John and Margaret established their home on this farm. There the family remained until John's death. Margaret and the children remained there at the time of the trial. It is not disputed that from the time they moved on the place until Margaret remarried, all of the income and profits of this farm have been retained by John and Margaret. During that time, Margaret testified, John paid the taxes and insurance premiums. She also testified that all of the members of the family commonly spoke of the farm as "John's farm". She told of instances indicating that John was actually regarded as the owner of the farm. She testified that on Easter Sunday of 1940 Peter and Rebecca were there. And we quote her words, "We were talking about land, who owned land, who had this, and so on, they said they give John and I that half section and then when George got married or wanted a home they was going to give him that half section at home." After John's death, a conversation took place between Mrs. Bentz and Margaret while driving home from town in which Margaret said she had said something about what John got out of all of his hard work, and Rebecca replied, "He got a farm." Again when Margaret and children were over to the home place they said to the children, "the place was Jimmy's and theirs since their daddy had passed away." Again, Margaret testified that Mrs. Bentz always said "the boys worked hard at home and they each got a farm for doing that. John had that place and George was getting the one at home."

Rebecca Bentz was sworn as a witness and did not deny any of these matters about which Margaret testified.

We turned to Peter's testimony. He denied that he and Rebecca had initiated the purchase of a place nearer the home farm. When asked if he told them he would buy them a farm, he said in substance that he told them nothing. He said the arrangement was that he and John would buy the place together, and that he was to have one-third of the crops. He also testified John agreed to repay one-half the the purchase price with interest. He first said that John

paid his half of the taxes from his share of the crops. Later he said he gave John the cash with which to make those payments and to pay insurance premiums. He explained the retention of the income by John, and his failure to pay any of the purchase price by saying that the expense of John's illness made payments impossible, and that John always said he would pay when he could. Peter said in substance that in allowing John to retain the income during his life, and his widow to retain that income after John's death, he was doing that which any father would do for his children.

In 1941 a malignant growth was discovered in one of John's eyes. Thereafter he had surgery and more or less constant treatment the nature of which is not disclosed by the records. He was in hospitals at Pierre, Rochester and New York City. Although he was incapacitated at times, he continued to work. They exchanged work on the two farms. While George was in the army Peter and John did the work. Peter testified that as he got older he could not keep up with the boys. Peter kept no record of the crops grown on John's place nor of the money he claimed to have advanced for John. He denied that he had referred to the place as John's. He said in substance that he called it "John's and mine."

Neighbors were called to testify that John referred to the place as his own. One of them testified that when John finally realized his illness was fatal, he came to him and wanted him to act as executor of his will. In that conversation, he said he wanted his boy to have the home quarter and each of the girls an eighty. This neighbor told him he should get George to act as his executor. Thereafter in December 1950 John did execute a will in which he named George as executor and in which, subject to a life estate to his wife, he left one-half of his real estate to his son, and the remaining half to his daughters.

A neighbor also testified that while George was in the army, Peter came to a field in which John and the neighbor were working and asked John to read a letter he had received from George. He testified "Peter Bentz was pretty well broke down, he didn't know if George would ever get back or not. We got to talking and he says, 'I give this

place to Johnny and when George gets back, if he gets back, I give the home place to him.' " Peter denied such a conversation took place or that he went to the field at all.

John died on the 16th of September 1951 and Margaret filed a petition to probate the will of John in October of that year in which she asked that letters testamentary issue to George. In that petition she describes the farm as the property of John. George who had lived at home with Peter and Rebecca and had worked shoulder to shoulder with his father and John during all of these events qualified as executor and filed an inventory and appraisement, and an inheritance tax inventory in which he listed the farm as an asset of John's estate. During the course of probate he filed a claim of $1,513.88 for advances made to John. However, his father who asserted in this action that John was indebted to him for one-half of the purchase price of the farm and for a share of the crops throughout the years filed no claim for such asserted indebtedness. Aside from the farm which was appraised at $16,000, John owned property which was appraised at $13,024. It was not until Margaret remarried and differences developed that Peter learned the actual state of the record title to the farm we have called John's. Thereupon this action was brought.

We are told that the written record John made during his lifetime offers such unequivocal and conclusive proof that he and Peter did not intend or understand the farm to have been given to John, that notwithstanding the substantial character of the remaining testimony which supports the court's finding, it was unreasonable for the court to find such a verbal gift had been made. The reference here is to the fact that (1) Peter and John signed the original proposal to purchase the farm; (2) Peter, Rebecca, John and Margaret signed the contract for deed; (3) the deed conveyed to those persons; (4) John procured a fire insurance policy in 1943, which he renewed in 1948, wherein Peter and John were named as owners; and (5) in the spring of 1950 John named his father and himself as owners of the place in an instrument executed in connection with the soil conservation program.

Viewed separately these facts seem impelling. However,

as the trier of the fact was required to weigh them in connection with the whole record, we so view them in testing the reasonableness of the trial court's finding. Moreover, because it is the function of the trial court to pass upon the credibility of witnesses, and the trial court left no room for doubt that he believed Margaret and the neighbors, and disbelieved Peter, we must look at these writings against the background of that accepted testimony. Thus approached the significance of this so-called written record is diminished.

From the testimony of Margaret it appears that, except for the statement of Mr. Bigelow to the effect that the company would refuse to enter into a contract with persons in their financial circumstances, John, or John and Margaret, would have been named as purchasers in the proposal to purchase. It was to provide such a responsible obligee as the company would require that Peter signed the proposal to purchase with John. In preparing the contract for deed, for some reason the record fails to explain, Rebecca and Margaret were added by the company as purchasers. Manifestly it was the form in which the company cast the contract for deed which was responsible for the form in which the conveyance was made in 1944. According to the record all Peter and John did in 1944 when deed was issued was to remit Peter's check for the then unpaid portion of the purchase price. Thus it fairly appears that the trial court believed the actual state of the title resulted, not from any intention entertained by either Peter or John, but from the insistence of Bigelow upon a responsible purchaser. It also appears as a fact that Peter paid so little attention to the details of these transactions he did not know the actual state of the record title until long after John's death. The inference is almost irresistible that Peter, Rebecca, George and Margaret harbored the belief down through the years that title rested in John. Only John seemed to know that such was not the fact, and even John seemingly had forgotten that the names of Rebecca and Margaret had been added as purchasers in drawing the contract for deed, because whenever it became necessary for him to truly represent the state of the legal title, he stated the title to be in Peter and himself. He so stated in purchasing fire insurance in 1943

and in 1948, and he made a like representation in 1950 in seeking soil conservation benefits.

· So the question which arises is what rational significance must be attached to the indisputable fact that John knew, or thought he knew, the title to be in Peter and himself in determining whether he and his parents intended the farm as a gift. To answer that question the trier of the fact was required to consider the statements made by the parents in John's presence, the impression those statements and the conduct of his parents made on his mind, and the conduct of all of the parties for more than ten years.

John's parents had indicated their desire to give this hard-working boy a farm as he was considering marriage. Peter conveyed the homestead to him, but he turned it back because, as Peter said, he did not want it. Then they later told him they would buy him a farm if he would move over where work could be exchanged in operating that farm and the home farm. In his presence during the negotiations for its purchase they said they were buying it for him. They put him in possession, and shortly thereafter when they were guests in his home at Easter time they said they had given him that half section. Again later in the presence of a neighbor Peter in substance said that he had given this place to John and he would give the home place to George when he came home. Further, all of the members of the family referred to the farm as John's in their every day conversations. From the outset they permitted John to retain all of the income from this farm. He in turn took his place as a member of the labor force which cropped this and the home place, but he retained all of the income from this farm. His illness and the expense thereof is offered as an explanation of the fact. Peter said in substance why ask him for anything, he did not have it. It is noteworthy that the income was retained before the onset of John's illness, and that during the years he used money in making improvements the trial court found to be substantial, without consulting Peter, and that he also accumulated personal property which was appraised at his death at over $13,000. It seems fair to conclude that the appraisement was conservative. Again John is described by Peter as an honest,

trustworthy boy. It is undisputed that he paid nothing to his father during these long years, and there is no indication that he ever even rendered an account of any character to Peter; the father admits he has no record of the crops grown on John's farm. Again, although in fact his total investment in this farm was about $300, John told his neighbor that his farm was paid for. Again when he knew he could not live he told another neighbor how he wanted to dispose of this farm. In fact it seems that all the evidenced conduct of both John and his parents from the outset until his death, and then the conduct of Margaret, Rebecca, George and Peter after John's death until the remarriage of Margaret squares with the theory that they all believed a verbal gift had been made to John.

It must be remembered that except for the fact that the donor has retained the legal title, the occasion for an action to specifically enforce a verbal gift of property does not arise. In our opinion, in the circumstances, because it was established that actually the legal title was in Peter, Rebecca, John and Margaret and John believed during the years it was in Peter and himself did not impel a finding that the parents had not made the claimed verbal gift. In concluding that such gift was in fact made, the trial court depended upon the direct affirmative testimony of Margaret and the neighbors and upon the day-to-day conduct of all of the family as above described.

Circumstances incidental to the trial may have exercised some influence on the court's mind. For instance, Rebecca was present at the trial and did not deny the testimony of Margaret. Then again there was the nature of Peter's testimony. Not only did he change his testimony in somewhat important matters, but after denying Margaret's version of conversations had, he failed to detail conversations between himself and John. He was content to state conclusions. He did not tell the court when, where and how he and John reached an agreement to buy the farm together, to share in the crops, and for repayment of the purchase price.

It seems not unreasonable to us for the trial court to have concluded that so long as this family remained united, no particular thought was given to legal or record title; in

their contemplation this farm had been given to John, and when George wanted a home, the home place was to be given to him. It was only when death broke the circle, and attempt was made to inject an unwelcome stranger, that they gave thought to and took action predicated upon the state of the legal title.

■ We have read and studied all of the cases cited and many more, but because each of these causes must rest on its own peculiar facts, we discern no reason for a review of those cases. We perhaps need not say again that the trier of the fact should approach decision in a cause of this nature with extreme caution to the end that litigants may have adequate protection against fraud. In one of the cases cited by counsel for the parents we find a statement as follows: "It is not within the power or province of a court of equity out of his bounty to his son, given ex gratia, to construct an obligation ex debito justicia against the father in the son's favor, and then enforce it, * * * with no better foundation to sustain it than the acceptance of that bounty by the son, * * *." O'Bryan v. Allen, 108 Mo. 227, 18 S.W. 892, 894, 32 Am.St.Rep. 595, at page 598. We concur, of course. But more is here. As we have indicated, there is so much of convincing substance in this record that we are unable to say that the clear preponderance of evidence is against the challenged finding of court.

The proposition we have considered is the only question upon which error was assigned and argument presented. Other questions are not before us.

The judgment and order of the trial court are affirmed.

All the Judges concur.